**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 5 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE CHICKASAW NATION,

    Plaintiff-Appellant,

    v.

UNITED STATES OF AMERICA,

    Defendant-Appellee.

No. 99-7042

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 97-CV-511-P)

---

Graydon Dean Luthey, Jr., of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, (Bob W. Rabon, of Rabon, Rabon & Wolf, Hugo, Oklahoma, with him on the briefs), for the appellant.

Charles F. Marshall, Tax Division, Department of Justice, Washington, D.C., (Ann B. Durney and Michelle B. O'Connor on the brief), for the appellee.

---

Before **BRISCOE**, **ANDERSON**, and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

The Chickasaw Nation (Nation) appeals from the district court's entry of judgment in favor of defendant United States on the Nation's claim for a refund of federal wagering and occupational excise taxes. The Nation alleges that these taxes were unlawfully assessed against its pull-tab gaming activities pursuant to 26 U.S.C. §§ 4401 and 4411. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

The Nation is a Native American Indian Tribe with its principal place of business in Ada, Oklahoma. Doing business under the names Chickasaw National Central Business Services and Chickasaw Enterprises, the Nation operates a number of for-profit business activities within the State of Oklahoma, including gaming centers, tobacco shops, convenience stores, gas stations, a motel, a restaurant, an accounting firm, a radio station, an internet service provider, and a computer store. All of the businesses are open to and utilized by members of the Nation and the general public.

As part of its business activities, the Nation sells "pull-tabs" at a variety of locations, including its gaming centers and convenience stores. A pull-tab is a two inch by four inch card or ticket containing five windows covered with tabs. Various symbols are found under the tabs. The face of the pull-tab discloses the combination of symbols that results in a winning ticket. To play a pull-tab, a

2

player simply pulls back each tab and checks the symbols found under the tabs to ascertain whether he holds a winning ticket. Depending upon the point of sale, players can purchase pull-tabs from a clerk or directly from a dispensing machine. Each pull-tab typically costs between 25 cents and one dollar, and typically allows a player to win between 25 cents and $2500. If a player purchases a winning pull-tab, he can redeem the award by presenting the pull-tab to a cashier at one of the points of sale. Although players frequently present winning tickets for payment on the date of purchase, it is not uncommon for them to claim their awards later.

The Nation purchases pull-tabs in series of 24,000 tickets. Each ticket in a series contains the same serial number. The ticket manufacturer prints each ticket in a series with a winning or losing combination of symbols. A fixed number of tickets in each series have a winning combination of symbols, and those tickets are distributed randomly throughout the series. It always takes the Nation more than one business day to sell an entire series of pull-tabs. Each ticket also indicates how many winners there will be in each series (e.g., four $500 winners, four $75 winners, etc.). Once all of the tickets in a series are sold to players, the series is officially closed and winning tickets are no longer honored.

The dispute between the Nation and the United States involves whether the Nation must pay wagering excise taxes and federal occupational taxes. During the time period relevant to this lawsuit, the Nation generally withheld income

3

taxes from pull-tab players' winnings in accordance with 26 U.S.C.§ 3402(q). The Nation also filed with the Internal Revenue Service (IRS) information returns concerning player winnings . The Nation did not, however, pay federal wagering excise taxes or federal occupational taxes in connection with its pull-tab sales. After conducting an audit, the IRS determined that the Nation was subject to federal wagering excise taxes under 26 U.S.C. § 4401(a)(1) for the period from August 1991 through August 1994, and federal occupational taxes under 26 U.S.C. § 4411 for the period from January 1993 through September 1994. On July 1, 1996, the Nation paid a total of $1,368.93 for federal wagering excise and occupational taxes determined by the IRS to be owing for July 1993. The Nation simultaneously filed with the IRS a claim for a refund of this amount.

The Nation subsequently waived its right to a statutory notice of disallowance of its refund claim and, on September 5, 1997, filed this action for refund. The United States counterclaimed for (1) the unpaid portion ($41,570.12) of the wagering excise taxes and interest assessed against the Nation for the period from August 1991 through August 1994, and (2) the unpaid portion ($1,782.48) of the occupational taxes and interest assessed against the Nation for the period from January 1993 through September 1994. The parties eventually filed cross-motions for summary judgment, and agreed that if the district court resolved the case on summary judgment, neither would "raise on appeal that a

4

controverted material fact exist[ed] which preclude[d] summary judgment." App. at 260 (pretrial order). On December 30, 1998, the district court entered judgment in favor of the United States.

## II.

We review de novo the district court's grant of summary judgment, applying the same standard as the district court under Federal Rules of Civil Procedure 56(c). See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When reviewing a grant of summary judgment, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms, 165 F.3d at 1326. Questions of law relevant to the summary judgment are reviewed de novo. C-470 Joint Venture v. Trizec Colorado, Inc., 176 F.3d 1289, 1291 (10th Cir. 1999).

## III.

The Nation attacks four aspects of the district court's decision. Specifically, the Nation contends that (1) pull-tabs do not involve a taxable wager, as defined in 26 U.S.C. § 4421, (2) it is not a "person" subject to federal wagering excise taxes, (3) the Indian Gaming Regulatory Act (IGRA)

5

demonstrates Congress' intent not to subject Indian gaming activities to federal wagering excise taxes, and (4) the self-government guarantee of the 1855 treaty between the United States and the Nation precludes imposition of the taxes in question.  We consider these arguments in order.

*Do pull-tabs constitute a taxable wager under 26 U.S.C. § 4421?*

The initial question is whether the purchase of one of the Nation's pull-tab cards constitutes a "wager" for purposes of the IRC.  Section 4401 of the IRC provides in pertinent part:

> (a) Wagers.
> (1) State authorized wagers.–There shall be imposed on any wager authorized under the law of the State in which accepted an excise tax equal to 0.25 percent of the amount of such wager.
> * * *
> (b) Amount of wager.–In determining the amount of any wager for the purposes of this subchapter, all charges incident to the placing of such wager shall be included; except that if the taxpayer establishes, in accordance with regulations prescribed by the Secretary, that an amount equal to the tax imposed by this subchapter has been collected as a separate charge from the person placing such wager, the amount so collected shall be excluded.
> (c) Persons liable for tax.–Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him.  Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery.  Any person required to register under section 4412 who receives wagers for or on behalf of another person without having registered under section 4412 the name and place of residence of such other person shall be liable for and shall pay the tax under

6

this subchapter on all such wagers received by him.

26 U.S.C. § 4401. The term "wager" is defined under the IRC as including "any wager placed in a lottery conducted for profit."[1] 26 U.S.C. § 4421(1)(C). In turn, the term "lottery" is defined under the IRC to include "the numbers game, policy, and similar types of wagering," but does not include "(A) any game of a type in which usually (i) the wagers are placed, (ii) the winners are determined, and (iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game . . . ." 26 U.S.C. § 4421(2).

In asserting that the purchase of a pull-tab card does not constitute a "wager," the crux of the Nation's argument is that its pull-tab games fall outside the IRC's definition of "lottery." The Nation contends that "the game involves one bet by one player only," "[e]ach bet is a new game with a new pull-tab card," "[t]he player is the only person playing the game when it is determined whether he wins or loses," and "[t]he prize, if he wins one, is distributed in his presence immediately." Pl.'s Opening Br., at 28. Thus, the Nation argues, the pull-tab games fall within the statutory exclusion from the definition of "lottery" set forth

---

[1] The term is also defined to include "(A) any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers, [and] (B) any wager placed in a wagering pool with respect to a sports event or a contest, if such pool is conducted for profit . . . ." 26 U.S.C. §§ 4421(1)(A) and (B). It is uncontroverted, however, that neither of these two categories are applicable here.

7

in 26 U.S.C. § 4421(2)(A).

As the Nation's arguments make obvious, the critical question is whether the Nation's pull-tab games can legitimately be characterized as a "lottery" under § 4421(2)(A) of the IRC. The starting point for answering this question is the plain language of § 4421(2)(A). See Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1460 (10th Cir. 1997). The words of the statute must be construed in their "'ordinary, everyday' sense." Julius M. Israel Lodge of B'nai B'rith v. Commissioner, 98 F.3d 190, 191 (5th Cir. 1996) (quoting Crane v. Commissioner, 331 U.S. 1, 6 (1947)). If the terms of the statute are clear and unambiguous, they are controlling absent rare and exceptional circumstances. Ramah, 112 F.3d at 1460.

As previously noted, § 4421(2)(A) provides a list of examples ("numbers game," "policy," and "similar types of wagering") that fall within the definition of "lottery." It is essentially undisputed that this list of examples is nonexhaustive. As the government correctly points out, the use of the word "includes" in the statutory definition signals Congress' intent to include within the definition various types of gaming not specifically mentioned in the statute. See West v. Gibson, 527 U.S. 212, 119 S.Ct. 1906, 1910 (1999) (holding that Congress' use of the word "including" in the statutory phrase "through appropriate remedies, including reinstatement or hiring," made "clear that the

authorization [of remedies] [wa]s not limited to the specified remedies there mentioned"). The question remains, then, what other types of games fall within the definition of the word "lottery."

To answer this question, it is helpful to refer to dictionary definitions of the word "lottery." See United States v. Roberts, 88 F.3d 872, 877 (10th Cir. 1996) (noting that if Congress does not define statutory term, "its common and ordinary usage may be obtained by reference to a dictionary"). Webster's defines the word "lottery" as "a scheme for the distribution of prizes by lot or chance," and "a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them usu[ally] as determined by the numbers on tickets as drawn at random (as from a lottery wheel)." Webster's Third New Int'l Dictionary 1338 (1993). Similarly, Black's defines the word "lottery" as "[a] chance for a prize for a price," and indicates the "[e]ssential elements of a lottery are consideration, prize and chance and any scheme or device by which a person for a consideration is permitted to receive a prize or nothing as may be determined predominantly by chance." Black's Law Dictionary 947 (6th ed. 1990). These definitions, which appear to represent the common and ordinary usage of the word "lottery," clearly encompass the specific types of games listed in § 4421(2)(A). For example, a "policy" is defined by Webster's as "a daily lottery in which participants bet that certain numbers will be drawn from a lottery

9

wheel." Webster's, supra, at 1754. Likewise, "numbers" (another of the examples listed in § 4421(2)(A)) is defined as "a form of lottery played in the U.S. in which one may select any three digits from 001 to 999 and bet on them to appear in a specified order or in any combination and in which the winning numbers and order are determined by figures regularly published in newspapers . . . ." Webster's, supra, at 1550.

Applying these definitions, it is apparent that the Nation's pull-tab system does, in fact, constitute a "lottery." In particular, the pull-tab system utilized by the Nation is a scheme by which prizes are randomly distributed to the winners among those persons who have paid for a chance to win them, i.e., by purchasing one or more pull-tab tickets in a series. Players purchasing tickets know there will be a specific number of prizes awarded in each series of tickets. Because the winning tickets in a series are randomly distributed throughout the series, neither the Nation nor the players know ahead of time which ticket purchasers will win the prizes.

The Nation contends its pull-tab system falls within the statutory exclusion for "(A) any game of a type in which usually (i) the wagers are placed, (ii) the winners are determined, and (iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game . . . ." 26 U.S.C. § 4421(2). According to the Nation, each individual pull-tab ticket should

10

be viewed as a separate "game," and, when viewed in this manner, "the game involves one bet by one player only," "[e]ach bet is a new game with a new pull-tab card," "[t]he player is the only person playing the game when it is determined whether he wins or loses," and "[t]he prize, if he wins one, is distributed in his presence immediately." Pl.'s Opening Br., at 28.

The district court rejected the Nation's arguments, finding that "[w]hen a customer purchases a pull tab, he is competing against every other person who purchases a pull tab from the same series for the limited number of winners contained in each series of pull tabs." App. at 269. Further, the district court concluded:

> The purchase of a pull tab constitutes only the play of a "gaming piece" in a game that consists of a "deal" or "series" of such pieces. The pull tab operators here have a continuing wager of prizes in a particular "deal," and this wager is accepted by all those who might purchase pull-tabs from that "deal" until all tickets are sold. The winners are determined at the time the series is manufactured, and thus, the winners are predetermined outside the presence of any persons placing wagers in such game.
> Therefore, pull tab gaming consists of a player selecting a card already vested with independent significance. As the Commissioner observed in Rev. Rul. 57-241, 1957-1 C.B. 419, 420, "[t]he inherent feature" of games that are excluded from the definition of lottery in Section 4421(2)(A) "is that of 'group play' . . .." By, (sic) contrast, Plaintiff's pull tab gaming activities represents discrete, individual, advance-purchase gambles that do not qualify for exclusion from the wagering tax.

App. at 273-74 (citations omitted).

We agree with the district court's conclusion. Contrary to the Nation's

11

arguments, whether pull-tab gaming constitutes a "lottery" for purposes of the IRC cannot be determined by viewing each individual purchase of a pull-tab ticket as a game unto itself. As previously noted, the tickets are purchased and resold by the Nation in series of 24,000 tickets, with a specific number of winning tickets randomly distributed throughout the series. Thus, when a player purchases a ticket, he is competing against all other persons who purchase tickets from that same series. It is uncontroverted that the prizes for a particular series of tickets are not awarded all at one time or in the same location. Rather, the prizes are (or at least can be) awarded at a number of the Nation's businesses over an extended period of time. Accordingly, the pull-tab gaming system does not fall within the statutory exclusion.

Because we conclude the Nation's pull-tab system constitutes a lottery, we likewise conclude the purchase of a pull-tab ticket constitutes a "wager" for purposes of IRC § 4401.

*Is the Nation a "person" for purposes of the federal taxes at issue?*

The Nation next asserts that it is not a "person" subject to the federal wagering excise tax set forth in § 4401, or the federal occupational excise tax set forth in 26 U.S.C. § 4411. Because resolution of this issue turns on statutory construction, our overriding purpose is to determine congressional intent. See

12

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982). "In ascertaining the plain meaning of [a] statute, [we] must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988). Where the will of Congress "has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" Griffin, 458 U.S. at 570 (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).

Section 4401 provides that "[e]ach person who is engaged in the business of accepting wagers shall be liable for and shall pay" the federal wagering excise tax. 26 U.S.C. § 4401(c) (emphasis added). Likewise, § 4411 provides that "[t]here shall be imposed a special tax of $[50] per year to be paid by each person who is liable for the tax imposed under section 4401 . . . ." 26 U.S.C. § 4411(a) (emphasis added). Because neither § 4401 nor § 4411 defines the word "person," it is agreed we must rely on the IRC's general "Definitions" provision, 26 U.S.C. § 7701. According to § 7701(a)(1), "[t]he term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. § 7701(a)(1).

Although § 7701(a)(1) does not specifically list "Indian tribes" or "Indian tribal governments," its definitional phrase is prefaced with the word "include."

13

According to § 7701(c), "[t]he terms 'includes' and 'including' when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined." 26 U.S.C. § 7701(c); see generally In re Joplin, 882 F.2d 1507, 1511 (10th Cir. 1989) (rejecting, under IRC § 7701(c), an interpretation of the revenue laws that would substitute the term "limited to" for "including"). Thus, the list of entities contained in § 7701(a)(1) cannot be construed as exhaustive, and its failure to specifically list Indian tribes or tribal organizations is not determinative of whether such entities are "persons" for purposes of this case. See Commonwealth Nat'l Bank of Dallas v. United States, 665 F.2d 743, 750 (5th Cir. 1982) (concluding that because the definition of the term "person" in IRC § 6671(b) contained the word "includes," it encompassed entities not specifically listed therein); Pacific Nat'l Ins. Co. v. United States, 422 F.2d 26, 30 (9th Cir. 1970) ("By use of the word 'include[s]' the definition [of 'person' in IRC § 6671(b)] suggests a calculated indefiniteness with respect to the outer limits of the term . . . ."); see also State of Ohio v. Helvering, 292 U.S. 360, 370 (1934) (construing broadly a statutory definition using the phrase "means and includes").

To determine whether Congress intended Indian tribes and tribal organizations to fall within the scope of § 7701(a)(1), we turn to the ordinary, common meaning of the word "person." See Perrin v. United States, 444 U.S. 37,

14

42 (1979) (noting that "words will be interpreted as taking their ordinary, contemporary, common meaning" at the time Congress enacted the statute); Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1254 (10th Cir. 1998) (noting that where Congress does not explain the specific meaning of a statutory phrase or term, a court may assume Congress intended the words to be given their ordinary meaning and determine such meaning through the use of dictionaries). Although "person" is sometimes interpreted to mean only "a human being," the dictionary definition alternatively indicates that it includes "a human being, a body of persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties." Webster's, supra, at 1686. Obviously, the narrow definition of "person" to mean only "a human being" is not consistent with the framework of § 7701(a)(1). In light of the list of entities included within § 7701(a)(1), we conclude that Congress must have intended to incorporate the broad definition of the word "person." Thus, we conclude that Congress unambiguously intended for the word "person," as used in § 7701(a)(1), to encompass all legal entities, including Indian tribes and tribal organizations, that are the subject of rights and duties. See generally Reich v. Arcadian Corp., 110 F.3d 1192, 1195 (5th Cir. 1997) (noting a statute is ambiguous if it is susceptible of two different meanings).

Our conclusion on this point is consistent with other decisions that have

15

construed the word "person," as used in the IRC, to encompass legal entities not specifically listed in the statutory definition. See Helvering, 292 U.S. at 371 (holding that when a state "becomes a dealer in intoxicating liquors," it "falls within the reach of the tax either as a 'person' under the statutory extension of that word to include a corporation, or as a 'person' without regard to such extension."); Estate of Wycoff v. Commissioner, 506 F.2d 1144, 1151 (10th Cir. 1974) (concluding that the definition of the word "person," as found in IRC §§ 2056(b)(5) and 7701(a)(1), includes individual states and the United States). To include Indian tribes and tribal organizations in § 7701(a)(1)'s definition of "person" is also consistent with a recent decision by the Eighth Circuit Court of Appeals. The Eighth Circuit held that the word "person," as used in §§ 6421 and 6675 of the IRC, encompasses Native American tribes. See Flandreau Santee Sioux Tribe v. United States, 197 F.3d 949, 951 (8th Cir. 1999). The Flandreau court recognized that "'[i]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'" Id. (quoting Commissioner v. Keystone Consol. Indus., 508 U.S. 152, 159 (1993)). The court similarly noted that the Internal Revenue Code "must be given as great an internal symmetry and consistency as its words permit." Id. (quoting Keystone, 508 U.S. at 159).

We also emphasize that were we to conclude that Indian tribes and tribal

16

organizations are excluded from § 7701(a)(1)'s definition of "person," we would essentially exempt tribes and tribal organizations from many forms of federal tax liability and render entire sections of the IRC superfluous. For example, § 7871 of the IRC extends to Indian tribes an exemption from the federal excise tax on diesel and special motor fuels that, like the federal wagering excise tax at issue here, is imposed on "persons" falling within the scope of § 7701(a)(1). See 26 U.S.C. §§ 4041(a) (imposition of fuel excise tax) and 7871(a)(2)(A) (exemption for tribes). If Indian tribes were held not to be "persons" within the meaning of § 7701(a)(1), then the exemption granted to Indian tribes by § 7871 would be unnecessary.

The Nation contends that Congress could not have intended to include Indian tribal governments within the scope of the word "person." The Nation points out that Congress specifically defined the phrase "Indian tribal government" in a separate subsection of § 7701,[2] but did not include that phrase in § 7701(a)(1)'s definition of the word "person." It is true that "'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts

---

[2] The phrase "Indian tribal government" is separately defined in § 7701 as "the governing body of any tribe, band, community, village, or group of Indians, or (if applicable) Alaska Natives, which is determined by the Secretary, after consultation with the Secretary of the Interior, to exercise governmental functions." 26 U.S.C. § 7701(a)(40).

17

intentionally and purposely in the disparate inclusion or exclusion.'" Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)). This canon of statutory construction, however, is not applicable here. As we have already concluded, Congress clearly did not intend for the list of entities in § 7701(a)(1) to be exhaustive. Thus, the omission of the phrase "Indian tribal government" is not determinative, even though that phrase is separately defined elsewhere in § 7740. In our view, it is telling that the terms "State" and "United States," both of which are separately defined in § 7701[3], are not among the entities specifically listed in § 7701(a)(1), yet both have been held to be "persons" within the meaning of § 7701(a)(1). See Estate of Wycoff, 506 F.2d at 1151 ("State" and "United States," although separately defined, are "persons" within meaning of § 7701(a)(1). If Congress wishes to exempt Indian tribes from excise taxes that otherwise might be reasonably construed as applying to them, it should do so explicitly.

The Nation cites two additional canons of statutory construction in support of its position. First, the Nation argues that federal statutes are to be construed liberally in favor of Native Americans. Second, the Nation notes that federal tax statutes are to be construed in favor of taxpayers. The problem, however, is that

---

[3] The term "State" is defined in 26 U.S.C. § 7701(a)(10). The term "United States" is defined in 26 U.S.C. § 7701(a)(9).

18

these canons of statutory construction apply only where the statute at issue is ambiguous. See Ramah, 112 F.3d at 1461 (discussing the rule of statutory construction favoring Native Americans); Royal Caribbean Cruises, Ltd. v. United States, 108 F.3d 290, 294 (11th Cir. 1997) (discussing the rule of statutory construction favoring taxpayers). Because we conclude § 7701(a)(1) unambiguously encompasses all legal entities that are the subject of rights and duties and that Indian tribes are such legal entities, the rules of statutory construction cited by the Nation are inapplicable.

Finally, the Nation offers two additional arguments in support of its assertion that it is not a "person" for purposes of § 7701(a)(1). Citing various Revenue Rulings, the Nation notes that the IRS has consistently held that Indian tribal governments are not subject to federal income tax. As the government correctly points out, however, these Revenue Rulings say nothing about the applicability of federal excise taxes to Indian tribes, and thus do not require the result sought by the Nation. Second, the Nation argues that it is a sovereign political entity immune from federal taxation. Again, however, there is no merit to this argument. It is well settled that "[t]he right of tribal self-government is ultimately dependent on and subject to the broad power of Congress." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980). Although Congress has often refrained from imposing taxes on Indian tribes, the Supreme

19

Court has never held unconstitutional a federal tax applied to Indians. See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States, 845 F.2d 139, 143 (7th Cir. 1988).

*Does the IGRA indicate Congressional intent not to impose federal wagering excise taxes or federal occupational taxes on Indian gaming activities?*

The Nation contends that the imposition of federal wagering excise taxes and the accompanying federal occupational taxes on its pull-tab games is contrary to both the spirit and letter of the IGRA, 25 U.S.C. §§ 2701-2721. According to the Nation, when Congress enacted the IGRA, it clearly intended to maximize tribal gaming revenues and "chose to limit application of the [IRC] in such a manner as to tax neither tribes nor their gaming operations." Pl.'s Opening Br., at 20.

The IGRA "divides gaming on Indian lands into three classes–I, II, and III–and provides a different regulatory scheme for each class."[4] Seminole Tribe of Florida v. Florida, 517 U.S. 44, 48 (1996). According to its declaration of purpose section, the IGRA was passed by Congress:

> (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

---

[4] The parties appear to agree that pull-tabs fall within Class II and are thus subject to oversight regulation by the National Indian Gaming Commission.

20

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702 (1988); see Seminole Tribe, 517 U.S. at 48 ("Congress passed the [IGRA] in 1988 in order to provide a statutory basis for the operation and regulation of gaming by Indian tribes."). The clear and unambiguous language of this provision contradicts the Nation's assertion that Congress' sole intent in enacting the IGRA was to "maximize tribal gaming revenues." Indeed, although the above-quoted provision indicates that Congress was interested in promoting tribal economic development and self-sufficiency, there is no mention of the phrase "maximizing tribal gaming revenues." Thus, the statute's statement of purpose does not, in and of itself, demonstrate any type of Congressional intent to place tribal gaming revenues beyond the reach of federal wagering excise or federal occupational taxes.

The remaining question is whether the IGRA expressly prohibits the imposition of federal wagering excise taxes on Indian tribal organizations engaged in gaming activities. In asserting that the IGRA does prohibit the

21

imposition of such taxes, the Nation points to a single subsection, 25 U.S.C.

§ 2719(d). That subsection, entitled "Application of Internal Revenue Code of

1986," provides:

> (1) The provisions of the Internal Revenue Code of 1986 (including sections 1441, 3402(q), 6041, and 6050I, and chapter 35 of such Code) concerning the reporting and withholding of taxes with respect to the winnings from gaming or wagering operations shall apply to Indian gaming operations conducted pursuant to this chapter, or under a Tribal-State compact entered into under section 2710(d)(3) of this title that is in effect, in the same manner as such provisions apply to State gaming and wagering operations.
> (2) The provisions of this subsection shall apply notwithstanding any other provision of law enacted before, on, or after October 17, 1988, unless such other provision of law specifically cites this subsection.

25 U.S.C. § 2719(d).

According to the Nation, § 2719(d) demonstrates Congress' intent to apply

only a limited number of IRC provisions -- those pertaining to the reporting and

withholding of taxes with respect to players' winnings -- to Indian gaming

operations. In support of this argument, the Nation contends that "[b]y

identifying as applicable only a specific type of code provision and omitting all

others, Congress confirmed its intent that the IRC provisions creating tax liability

not apply." Pl.'s Opening Br., at 21. Further, the Nation asserts that "if tribal

activities under IGRA were already subject to the IRC, then § 2719(d)'s

application of only certain IRC sections to such activities is mere surplusage

. . . ." Id.

22

We reject the Nation's arguments. First of all, it is clear that § 2719(d) does not expressly prohibit the imposition of federal wagering excise or federal occupational taxes on Indian gaming activities. Instead, the statute provides only that IRC provisions "concerning the reporting and withholding of taxes with respect to the winnings from gaming or wagering operations shall apply to Indian gaming operations . . . in the same manner as such provisions apply to State gaming and wagering operations." In other words, the statute provides that Indian gaming operations, like state gaming operations, must report certain player winnings to the federal government, and must likewise withhold federal taxes if players' winnings exceed a certain level. See, e.g., 26 U.S.C. § 3402(q) (outlining withholding requirements on certain gambling winnings).

Although the Nation would have us infer from this language that Congress intended not to impose federal wagering excise and federal occupational taxes on Indian gaming activities, a review of the historical backdrop to the IGRA suggests that such an inference is unreasonable. Over the past thirty years, "Indian governments have occupied an anomalous niche within the structure of federal tax laws, enjoying some of the privileges afforded states, while at the same time being subjected to many of the burdens borne by ordinary individual taxpayers." Robert A. Williams, Jr., Small Steps On the Long Road to Self-Sufficiency for Indian Nations: The Indian Tribal Governmental Tax Status Act of 1982, 22 Harv.

23

J. on Legis. 335, 358-59 (1985).  Prior to 1982, the IRS took contradictory positions regarding the tax status of Indian tribes, concluding tribal income was exempt from federal taxation, while at the same time concluding that tribes were not entitled to other tax advantages granted to states and their political subdivisions.  See id. at 359-61.  In an attempt to alleviate this situation to some degree, Congress enacted the Indian Tribal Governmental Tax Status Act of 1982 (Tax Status Act), 26 U.S.C. § 7871, and granted tribes some of the tax advantages enjoyed by states and their political subdivisions.  See id. at 369-70.  In particular, the Tax Status Act extended to tribes many, but not all, of the federal excise tax exemptions typically enjoyed by the states (such as exemptions for federal excise taxes on special fuels).  See id. at 374-75.  Among the federal excise tax exemptions enjoyed by the states but not granted to tribes in the Tax Status Act was the exemption found in the IRC for "State-conducted lotteries." See 26 U.S.C. § 4402(3) (granting an exemption from federal wagering excise and occupational taxes for state-conducted lotteries).

Thus, when the IGRA was being discussed in Congress in the mid-to-late 1980's, Indian tribes remained subject to certain federal excise taxes, including federal wagering excise taxes (and the accompanying federal occupation taxes). Although "[t]he original language of S.555, the bill that became IGRA, included an explicit exemption for Indian gaming from [the] federal [wagering] excise tax,

24

. . . that exemption was deleted prior to passage." Little Six, Inc. v. United States, 43 Fed. Cl. 80, 83 (Fed. Cl. 1999). The only surviving reference to taxation in the IGRA was § 2719(d), which simply provided that Indian gaming operations were required to report and withhold certain player winnings in the same manner as state gaming operations. In light of this history, we believe it is unreasonable to assume that Congress intended, by way of negative inference from § 2719(d), to exempt Indian tribes from the federal wagering excise taxes.

We also reject the Nation's suggestion that Indian tribes were not subject to the IRC's reporting and withholding requirements for gaming winnings prior to enactment of the IGRA. To the contrary, a review of the applicable reporting and withholding provisions indicates that Indian tribes, like other persons involved in gaming operations, were responsible for reporting and withholding federal taxes for winnings exceeding a certain level. See, e.g., 26 U.S.C. § 3402(q) (1988). For purposes of our analysis it is important to note that the reporting and withholding requirements applicable to Indian tribes and other persons were somewhat more demanding than those applicable to state gaming operations. For example, immediately prior to enactment of the IGRA, states were responsible for reporting and withholding taxes from lottery winnings that exceeded $5,000, whereas other persons were responsible for reporting and withholding taxes from lottery winnings that exceeded $1,000. 26 U.S.C. § 3402(q)(3)(B) and (C)

25

(1988). The IGRA, by way of § 2719(d), effectively relaxed a tribe's reporting and withholding requirements to make them equivalent to those applicable to state gaming operations.

In a final effort to persuade us that its interpretation of § 2719(d) is correct, the Nation points to a December 12, 1991 letter sent by Senator Daniel Inouye, one of the authors of the IGRA, to the Commissioner of the IRS. In his letter, Senator Inouye suggests that by specifically referring to Chapter 35 in § 2719(d), "it was the intention of Congress that the tax treatment of wagers conducted by Tribal governments be the same as that for wagers conducted by state governments under Chapter 35 of the Internal Revenue Code." App. at 100. There are at least two reasons why Senator Inouye's letter is not controlling. First, the comments of a single senator, made years after the statute at issue was enacted, are of little value in interpreting the statute. See Texas Indus. v. Radcliff Materials, Inc., 451 U.S. 630, 644 n.17 (1981) ("Courts, of course, should be wary of relying on the remarks of a single legislator . . . ."); New York Tel. Co. v. New York State Dep't of Labor, 440 U.S. 519, 563 n.18 (1979) ("The comments . . . of a single Congressman, delivered long after the original passage of the [act at issue], are of no aid in determining congressional intent . . . ."). Second, it is apparent, for the reasons outlined above, that Senator Inouye's interpretation of § 2719(d) is inconsistent with both the language and the legislative history of the

statute. Although it is true that § 2719(d)'s reference to Chapter 35 is somewhat cryptic (since Chapter 35 pertains solely to wagering excise taxes and has nothing to do with the reporting and withholding of taxes on wagering winnings), we believe the most reasonable conclusion is that the reference was included in order to incorporate Chapter 35's definitions of the terms "wager" and "lottery." In any event, we are unwilling to assume, based solely upon the inclusion of this parenthetical reference to Chapter 35, that Congress intended to provide tribes with the exemption from federal wagering excise taxes enjoyed by the states. Such an assumption would fly directly in the face of § 2719(d)'s express reference to "the reporting and withholding of taxes with respect to the winnings from gaming or wagering operations." Had Congress intended to provide tribes with an exemption from the federal wagering excise taxes, it clearly knew how to draft such an exemption.

*Does the 1855 treaty preclude imposition of federal wagering excise taxes on the Nation?*

The final issue is whether the 1855 treaty entered into by the Nation and the United States provides the Nation with an exemption from the federal wagering excise and occupational taxes at issue. To decide this question, we must first determine what standard of review to apply in analyzing the text of the treaty. The Ninth Circuit has indicated that a treaty must contain a "definitely expressed

27

exemption." Confederated Tribes of Warm Springs Reservation v. Kurtz, 691

F.2d 878, 882 (9th Cir. 1982). In contrast, the Third and Eighth Circuits,

recognizing that treaties between the United States and Indian tribes were

typically entered into long before passage of a federal income tax (or other types

of federal taxes), have held that the proper test is whether a treaty "'contains

language which can reasonably be construed to confer [tax] exemptions.'" Lazore

v. Commissioner, 11 F.3d 1180, 1185 (3d Cir. 1993) (quoting Holt v.

Commissioner, 364 F.2d 38, 40 (8th Cir. 1966)). If a treaty contains such

language, these circuits hold, it will be liberally construed in favor of the Indians.

See id. Because we conclude this latter approach is the more reasonable one, we

adopt and apply it in reviewing the 1855 treaty between the Nation and the United

States.

The Nation points to Article VII of the 1855 Treaty, which provides:

So far as may be compatible with the Constitution of the United
States and the laws made in pursuance thereof, regulating trade and
intercourse with the Indian tribes, the Choctaws and Chickasaws
shall be secured in the unrestricted right of self-government, and full
jurisdiction, over persons and property, within their respective limits;
excepting, however, all persons, with their property, who are not by
birth, adoption or otherwise citizens or members of either the
Choctaw or Chickasaw Tribe, and all persons, not being citizens or
members of either Tribe, found within their limits, shall be
considered intruders and be removed from, and kept out of the same,
by the United States agent, assisted if necessary by the military, with
the following exceptions, viz.: Such individuals as are now, or may
be in the employment of the Government, and their families; those
peacefully traveling or temporarily sojourning in the country of

trading therein, under license from the proper authority of the United States, and such as may be permitted by the Choctaws or Chickasaws, with the assent of the United States agent, to reside within their limits, without becoming citizens or members of either of said Tribes.

In our view, this language cannot be reasonably construed to give rise to an exemption from any federal excise taxes. The Nation's sole argument in this regard is that the taxes at issue interfere with the right to self-government granted in Article VII of the treaty. This is a questionable proposition. Although the federal wagering excise tax at issue undoubtedly reduces the profit earned by the Nation on its gaming activities, the tax does not otherwise appear to interfere with the Nation's pull-tab wagering operations. Even assuming, *arguendo*, that the tax does interfere with the Nation's right to self-government, there appears to be no authority that would allow a treaty provision granting a tribe the right to self-government to trump the federal government's authority to impose excise taxes upon a tribe. Indeed, the Supreme Court has consistently characterized Indian tribes as "domestic dependent nations," Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831), subject to the "paramount authority" of the federal government. Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408, 451 (1989). Thus, we conclude a treaty provision must be more explicit than the one at issue to exempt an Indian tribe from federal excise taxes.

IV.

The judgment of the district court is AFFIRMED.