308 F.3d 1096
 Joseph SAPONE and Kimberly Sapone, individually and as guardians of Daya Sapone, Plaintiffs-Appellants,
v.
GRAND TARGHEE, INC., a Wyoming corporation, d/b/a Grand Targhee Ski and Summer Resort, and Bustle Creek Outfitters, Inc., a Wyoming corporation, Defendants-Appellees.
 No. 01-8021.
 United States Court of Appeals, Tenth Circuit.
 October 3, 2002.
 
 William R. Fix, Jackson, WY, for Plaintiff-Appellant Daya Sapone.
 James K. Lubing, Jackson, WY, for Defendant-Appellee Grand Targhee, Inc. and R. Eric Peterson, (Monty L. Barnett with him on the brief) of White & Steele, Denver, CO, for Defendant-Appellee Bustle Creek Outfitters.
 Before SEYMOUR, McKAY and HENRY, Circuit Judges.
 HENRY, Circuit Judge.
 
 
 1
 Represented by her parents, Joseph Sapone and Kimberly Sapone, as guardians ad litem, Daya Sapone appeals the district court's grant of summary judgment in favor of Appellees, Grand Targhee, Inc. ("GT") and Bustle Creek Outfitters ("BCO") in this personal injury diversity suit. Daya argues that the district court erred when it found that (1) falling from a bolting horse is an inherent risk that creates no duty on the part of the defendants under the Wyoming Recreation Safety Act ("WRSA"), Wyo. Stat. Ann. §§ 1-1-121 through 123 and, (2) that no other triable issue of material fact remained. Because the record contains some evidence that suggests that Daya may have fallen from the horse from GT/BCO's negligence that was not also an inherent risk of the activity, genuine questions of material fact remain which are relevant to the question of whether the plaintiff's injury was caused by an inherent risk. Accordingly, we conclude the district court erred when it granted summary judgment for the defendants, and we REVERSE the judgment of the district court and REMAND the decision for further proceedings consistent with this opinion.
 
 I. Background
 
 2
 Because we review a grant of summary judgment for the defendants, we look to the facts that are most favorable to the plaintiff. See Simms v. Oklahoma ex. rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999) ("[W]e view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."); Fed.R.Civ.P. 56.
 
 
 3
 On August 31, 1999, while vacationing at the Grand Targhee Ski and Summer Resort in Alta, Wyoming, Kimberly and Joseph Sapone arranged for their two children, Daya and Sean Sapone, to participate in a two-hour, private horseback riding lesson with BCO arranged by GT's activity desk. While arranging the ride for her young children, Ms. Sapone was advised the riders would be "safe." Aplt's App. at 138. The lesson, a trail ride, was conducted by BCO, which provided the Sapone children with wrangler Donna Ricks. At the time of the lesson, Ms. Ricks had two weeks of experience conducting horseback riding lessons for BCO and was acting as a substitute for full time personnel. Ms. Ricks selected horses for the children and prepared the horses with their saddles. Although helmets were available during this outfitting, she did not provide helmets for the children.
 
 
 4
 Without further preparation, the private group embarked on their ride along a trail used for alpine skiing during the winter season. Ms. Ricks did not have the children practice in the nearby corral, nor did she provide instructions on the handling of the horse.
 
 
 5
 There is disagreement in the record about what happened toward the end of the trail ride. According to Ms. Ricks, she unleashed the halter rope of Daya's horse approximately one-quarter of a mile from the stables as they were on the return portion of their ride, descending one of the mountain slopes, an act she testified was a "stupid" thing to have done. See Aplt's App. doc. 3, at 17 (Depo. of Donna Ricks, dated June 27, 2000). However, according to Sean Sapone, the three rode in a single file, with Ms. Ricks at the lead and Daya in the rear, and at no time during the ride did Ms. Ricks hold halter ropes leading back to either his or Daya's horse. See id. doc. 5, at 81 (Depo. of Sean Sapone, dated August 21, 2000).
 
 
 6
 During their descent down the mountain trail, Daya's horse suddenly "bolted" for the stables, and Daya fell from her saddle. With her foot stuck in the stirrup, she landed on her head and was dragged along the ground for at least several paces before she could wrench her foot free and roll to her back. In the process, her head was struck by the horse's hoof. Following the accident, the group returned to the stables, where Sean spent some time in the practice corral. Daya declined to join them at this time because of her fear of getting back on the horse.
 
 
 7
 There is also disagreement in the record as to whether this was the first time the children spent in the practice corral. According to Sean Sapone, this was the first time he spent in the practice corral. See id. However, Ms. Ricks testified that both children spent time in the practice corral before the group embarked on the trail ride. See Aplt's App. doc. 3 at 012 (Depo. of Donna Ricks).
 
 
 8
 After completing the lesson, the children were instructed to wait for a parent. Despite the facts that Daya had cried for a while, complained of pain in her hip, and refused to get back on the horse, Ms. Ricks did not seek medical assistance for Daya's injuries. See id. at 27. Further, Ms. Ricks left the children and proceeded to go on her next ride, without informing either parent of the accident. Daya's mother learned of the accident several days later, after Daya complained of head and body aches.[1] Medical visits determined that Daya had received a concussion from the fall or the kick to the head. Another doctor suggested that the fall had likely produced the migraine headaches that Daya was then experiencing. Additionally, Daya may have suffered some permanent brain damage and spinal trauma, for which she has undergone some therapy.
 
 
 9
 Daya brought suit against GT and BCO in the United States District Court for the District of Wyoming. She alleged that GT/BCO breached the duty of care that they owed to her. Specifically, her complaint alleged negligence from the defendants' failure:
 
 
 10
 (a) to eliminate dangers and hazards in the animal of which [BCO] was aware or should have been aware before directing [Daya] Plaintiff to ride;
 
 
 11
 (b) to warn Plaintiffs of dangers and hazards of riding the horse, of which the Defendants had actual or constructive knowledge;
 
 
 12
 (c) to adequately instruct foreseeable users and handlers of the horses, including ... Daya ..., as to the proper and safe handling and use of the animal;
 
 
 13
 (d) to follow applicable federal regulations regarding the provision of such services to minors;
 
 
 14
 (e) to notify the parents of the accident so that proper medical attention could be sought; and
 
 
 15
 (f) to provide proper safety equipment, including but not limited to, appropriate headgear.
 
 
 16
 Aplt's App. doc. 2, at 2-5 (Complaint, filed Jan. 31, 2000).
 
 
 17
 The defendants moved for summary judgment, arguing that under the WRSA, a bolting horse is an inherent risk of horseback riding. Thus, the defendants argued that they owed Daya no duty of care and that her suit should be foreclosed because negligence suits from inherent risks have been proscribed by the Wyoming statute. The defendants also argued below, but not on appeal, that because the plaintiff's mother signed a release form which contained an exculpatory clause, summary judgment was appropriate.
 
 
 18
 Daya countered that an inherent risk is a factual question for a jury to decide. Specifically, she pointed to evidence in the record suggesting Ms. Ricks' misfeasance. Daya further argued that a jury might find gross negligence from Ms. Ricks' willful and wanton conduct, which would give the WRSA no application to the case.
 
 
 19
 The district court determined that falling from a "bolting" horse is an inherent risk of horseback riding, did not address Daya's individual claims, and did not reach the merits of the defendants' second argument. In so doing, the court cited interpretations of the WRSA by the Wyoming Supreme Court in Halpern v. Wheeldon, 890 P.2d 562 (Wyo.1995) and by this court in Cooperman v. David, 214 F.3d 1162 (10th Cir.2000). In addition, the district court considered the testimony of the plaintiff's expert witness and found that nothing in her testimony, "suggests that a horse bolting as it nears a corral is not an inherent risk of horseback riding." Aplt's App. doc. 7 at 129 (Order, filed February 16, 2001). Thus, it reasoned that under the WRSA the defendants owed the plaintiff no duty. Accordingly, the district court granted the defendants' motion for summary judgment. Daya now appeals the district court's grant of that motion.
 
 II. Discussion
 
 20
 a. Standard of Review
 
 
 21
 We review the grant of summary judgment by the district court de novo. See Simms, 165 F.3d at 1326. In so doing, we apply the same legal principles as used by the district court. See id. Specifically, a grant of summary judgment requires that there be no factual questions which might affect the outcome of the suit under existing law. See Chickasaw Nation v. United States, 208 F.3d 871, 874-74 (10th Cir.2000); Fed.R.Civ.P. 56(c). Although a mere factual dispute need not preclude summary judgment, genuine issues of material fact "will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material." Id. Further, when applying this standard, we "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms, 165 F.3d at 1326. Because this is a diversity case, we apply the substantive law of Wyoming, the forum state. See Wood v. Eli Lilly & Co., 38 F.3d 510, 513 (10th Cir.1994) ("[W]e must apply the most recent statement of state law by the state's highest court."). In a diversity action, "[w]here no state cases exist on a point, we turn to other state court decisions, federal decisions, and the general weight and trend of authority." Barnard v. Fireman's Fund Ins. Co., 996 F.2d 246, 248 (10th Cir.1993) (internal quotation marks omitted).
 
 
 22
 b. The Recreation Safety Act
 
 
 23
 In granting summary judgment, the district court relied upon the WRSA and case law that applies the WRSA, specifically Halpern and Cooperman. The relevant portion of the WRSA states:
 
 
 24
 (a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.
 
 
 25
 (b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.
 
 
 26
 (c) Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved....
 
 
 27
 Wyo. Stat. Ann. § 1-1-123. Inherent risks are defined as "those dangers which are characteristic of, intrinsic to, or an integral part of [the] sport." Id. § 1-1-122.
 
 
 28
 The Wyoming statute, originally passed in 1989, has been amended several times. Its original sponsors were motivated to provide some additional protection from provider liability resulting from alpine skiing activity within the State. See Catherine Hansen Stamp, Recreational Injuries and Inherent Risks: Wyoming's Recreational Safety-Act An Update, 33 Land & Water L.Rev. 249, 271 (1998) (hereinafter Inherent Risks). In 1993, an amendment to the statute was drafted to include an alternative definition for the inherent risk of equine activities. This enactment followed a trend among some western state legislatures to pass laws protecting sponsors of equine activities by granting some form of reduced liability. One author has noted that by 2000, forty states had enacted statutes providing protection for equine activity sponsors. See Terrence J. Centner, Tort Liab. for Sports and Recreational Activities: Expanding Statutory Immunity for Protected Classes and Activities, 26 J. Legis. 1, 14 (2000).
 
 
 29
 The legislature most recently amended the WRSA in 1996 to clarify the meaning of inherent risk. See Recreational Safety Act — amends., S.F. No. 0065 (Wyo.1996). Wyoming considered various approaches to its equine liability regime, rejecting proposals that would have foreclosed all negligence suits from the sports and recreational activities included within the statute. That is, the Wyoming legislature did not limit allowable tort suits to intentional or gross acts of negligence. It did not define the meaning of "inherent risk" more precisely through careful iteration. See Inherent Risks, supra at 261-62 (citing H.R. 0159, 52nd Leg. (Wyo.1992)). Likewise, although the legislature considered establishing a list of statutory equine duties, it ultimately decided not to do so. See id. In the end, the legislature settled on an approach that leaves to the courts the task of defining what is and what is not an inherent risk within the meaning of the statute. Presumably, this approach has the advantage of permitting courts to make fact-specific findings and to develop the law in response to changing circumstances.
 
 c. Halpern
 
 30
 The Wyoming Supreme Court has had but one opportunity to apply the WRSA, and that was before the statute was most recently amended. In Halpern, the court held that the statute should be interpreted according to the doctrine of assumption of risk in its primary sense — i.e. as a law creating no duty on the part of the defendant. See 890 P.2d at 565 ("Under the clear and unambiguous language of the Act, the assumption-of-risk terminology is intended to limit the duty which a provider owes to a participant.").
 
 
 31
 Specifically, Halpern involved an injury suffered while the plaintiff was attempting to mount his horse. There the plaintiff fell to the ground when his horse bucked suddenly, and he broke his ankle as a result. In reversing a grant of summary judgment to the defendants, the court noted that:
 
 
 32
 In this case, genuine issues of material fact exist with regard to whether the risks encountered by Mr. Halpern are intrinsic to the sport of horseback riding and whether the [defendants] could have reasonably altered, eliminated, or controlled those risks. A genuine issue of material fact exists as to whether the [defendants] could have assisted Mr. Halpern in mounting the horse in a different manner and, thereby, reduced or eliminated the risks which are associated with mounting.
 
 
 33
 Id. at 566.
 
 
 34
 The court further noted that even though whether a risk is an "inherent risk" goes to whether a duty exists, which is "[g]enerally" a legal question, "the duty issue involves questions which are basic issues of fact." Id. at 565. Where genuine issues of material fact exist, the determination of whether something is or is not an inherent risk is a factual question that must be sent to the jury for determination. See id. at 566 ("We have reviewed numerous cases and authorities on this issue, and we conclude that, when genuine issues of material fact exist, it is proper to present the issue to the jury of whether a risk is inherent to a particular activity."). In this regard, the Halpern court noted "[w]hat risks in a sport are inherent, obvious, or necessary to its participation, [is] a question that ordinarily must be resolved by the jury.'" Id. (quoting Dillworth v. Gambardella, 970 F.2d 1113, 1119 (2d Cir.1992)).
 
 
 35
 The Halpern court seemed to invite a list enumerating what constitutes an inherent risk:
 
 
 36
 Many of our sister states' inherent risk statutes provide nonexclusive lists of risks which the Legislatures have determined are inherent to certain activities. When a court is presented with a case under that type of statute, it may compare the facts of the case to the list of legislatively defined inherent risks and decide, as a matter of law, whether the plaintiff's injury resulted from an inherent risk. The Wyoming Legislature did not provide the courts with that type of guidance.
 
 
 37
 Halpern, 890 P.2d at 566 (citations omitted). See e.g. Colo.Rev.Stat. Ann. § 13-21-119(2)(f) (defining "[i]nherent risks of equine activities" as "those dangers or conditions which are an integral part of equine activities ..., as the case may be, including, but not limited to: (I) The propensity of the animal to behave in ways that may result in injury, harm, or death to persons on or around them; (II) The unpredictability of the animal's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals; (III) Certain hazards such as surface and subsurface conditions; (IV) Collisions with other animals or objects; (V) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his or her ability"); Fla. Stat. ch. 773.01(6) (enumerating similar risks); Mass. Gen. Laws ch. 128, § 2D (enumerating similar risks); Ohio. Rev.Code Ann. § 2305.321(A)(6) (enumerating similar risks).
 
 
 38
 After Halpern, the Wyoming legislature apparently deciding such a list to be impractical, amended the WRSA to redefine "inherent risk" from "any risk that is characteristic of or intrinsic to any sport or recreational opportunity and which cannot reasonably be eliminated, altered or controlled" to omit the underlined language. Wyo. Stat. Ann. § 1-1-122(a)(i); see also Inherent Risks, supra at 261-62. The Wyoming Supreme Court has not had the opportunity to apply this amended section, but in Cooperman, we concluded that "the Wyoming Supreme Court would apply the same analytical approach to the amended [WRSA] as it did to the [WRSA] before this amendment." Cooperman, 214 F.3d at 1166, n. 3.
 
 d. Cooperman
 
 39
 In Cooperman, we affirmed the district court's grant of summary judgment in favor of the defendants, and held that slipping cinches are an inherent risk of horseback riding. There the plaintiff, Dr. Cooperman, had fallen off of his horse after the cinch which attached his saddle became so loose that his saddle slipped all the way around to the horse's ventral side, causing the plaintiff to fall to the ground.
 
 
 40
 The Cooperman court, following the analytic framework set up in Halpern, determined what constitutes an inherent risk. We defined inherent risks as either "`those risks which are essential characteristics of a sport and those which participants desire to confront,' or they are undesirable risks which are simply a collateral part of the recreation activity." Id. at 1167 (quoting Inherent Risks, supra at 271). Next, the court determined whether there were any material questions of fact which were not encompassed by the statute and which might preclude summary judgment. See id. In addressing the latter question, we noted that "when attempting to determine whether a risk is inherent to a sport, we can not look at the risk in a vacuum, apart from the factual setting to which the rider was exposed." Id. Instead, we must analyze the risk "at the greatest level of specificity permitted by the factual record." Id. As an example of this principle, we explained
 
 
 41
 If the only fact presented to the court is that the horse bucked while the rider was properly sitting on the horse, we would frame the duty question as whether a bucking horse is an inherent risk of horseback riding. However, if the facts established that the owner of the horse lit firecrackers next to the horse and the horse bucked, we would ask whether a horse bucking when firecrackers are lit next to the horse is an inherent risk of horseback riding.
 
 
 42
 
 Id.
 
 
 
 43
 The Coopermans relied upon their expert witness and the testimony of the defendant's employee to establish a material question of fact. However, the plaintiffs' expert witness acknowledged that slipping saddles are an inherent risk of horseback riding. She testified that saddles can slip for a variety of reasons which might include "stretching leather, the tensing or relaxing of a horse, the horse losing weight from sweat, the compression of certain types of saddle pads and loosening of the cinch due to the movement of the horse, or the rider failing to ride straight in the saddle," and that risks might also be run if the saddle is cinched too tightly. Id. at 1168. We noted that the testimony of the defendant's employee, which stated, "if the saddle just fell off and was hanging loosely under the belly, then obviously the saddle wasn't tightened enough," did not address the issue further to "explain why the saddle was not cinched tightly enough." Id. at 1168-1169. We concluded that this testimony did "not take us outside the realm of inherent risk." Id. at 1168.
 
 
 44
 Because the plaintiffs "presented no evidence to dispute this finding, nor had the Coopermans put on evidence establishing a more precise cause for the accident that was not an inherent risk, the [district] court determined that there were no material questions of fact precluding the grant of summary judgment." Id. at 1164. We affirmed, concluding that the Coopermans had not presented evidence that raised a question of material fact which might preclude our dismissal of the suit. Id. at 1168 ("[T]he Coopermans must provide some evidence to explain why the saddle fell, which explanation is not an inherent risk.").
 
 e. Application
 
 45
 Here, as in Cooperman, "[i]n order to prevail on any negligence action, a plaintiff must first establish that the defendant owed him or her a duty of care." Id. at 1165; see also Halpern, 890 P.2d at 565. Thus, Daya carries the burden of establishing that her injury was not caused by an inherent risk. We might observe that the facts show that she fell from the horse. Of course, it is an inherent risk that a horse might bolt, but that is not the specific question before us. See Cooperman, 214 F.3d at 1168 ("If this were the only fact ... presented, we would quickly agree with the district court that [falling off of a bolting horse] is an inherent risk of horseback riding."). But, as in Cooperman, the facts before us require a greater degree of specificity. Daya presented evidence from an expert witness that (1) the instructions were inadequate, (2) the horse was too large, (3) headgear should have been provided, (4) the trail ride may have been too dangerous, and (5) her parents were not notified of the accident. See Cooperman, 214 F.3d at 1163 (indicating that at the outfitter's "employees ... matched riders to the horses based on the size, weight, height, and experience of the riders and the disposition of the horses.... [O]ne of the employees provided the Coopermans with a brief safety orientation, which included basic riding techniques and safety issues.")
 
 
 46
 Thus, we disagree with the district court's conclusion that falling from this particular bolting horse is an inherent risk of horseback riding. Daya presented evidence to show that the injury may have been caused not by an inherent risk, but rather "by a risk that was atypical, uncharacteristic, [and] not intrinsic to the recreational activity of horseback riding." Id. at 1169. Although some dispute exists as to whether adequate instructions and oversight were given, we believe that there is sufficient evidence in the record to raise these as questions of material fact. At oral argument, defense counsel not only conceded that defendants were under a duty to provide the children horseback riding instructions before they embarked on a trail ride, but stated that he so answered as a matter of "common sense." In addition, we believe that the defendants' duty might also reasonably encompass (1) providing adequate headgear, (2) equipping a six-year old with a pony rather than a horse, (3) giving the lesson in the practice corral instead of on an advanced trail ride, and indeed (4) notifying Daya's parents of the accident. The failure to fulfill these obligations may constitute violations of a duty separate and distinct from those embedded in the inherent risks of horseback riding.
 
 
 47
 Further support for this holding is found in Carden v. Kelly, 175 F.Supp.2d 1318 (D.Wyo.2001), where the defendants' motion for summary judgment was denied in factually similar circumstances. The plaintiff in that case presented an affidavit from a master riding instructor, who testified that the defendant had been negligent by failing to educate the plaintiff on how to handle the horse, by improperly matching the horse to the plaintiff, and by taking the plaintiff up a steep rocky slope which led the horse to slip and fall. In particular, the district court found that "whether the Defendants owed the Plaintiff ... a duty of care depends on whether the slipping and falling of the horse, under the facts of the present case, was an inherent risk of horseback riding under the [WRSA]." Id. at 1327. The plaintiff had been injured when her horse stumbled, fell, and rolled over onto her. The district court stated:
 
 
 48
 Properly framed, the duty question in the present case is whether a horse ... stumbling and falling and consequently causing injury to an inexperienced rider, is an inherent risk of a guided day trip trail horseback ride onto a steep rocky slope with no marked trail.
 
 
 49
 Id. at 1328; see also Madsen v. Wyoming River Trips, Inc., 31 F.Supp.2d 1321, 1328, 1329 (D.Wyo.1999) (stating that "getting bucked off of a horse, in certain situations, may be an inherent risk to horseback riding" and further noting that "[i]f the duty question is framed incorrectly, the legislature's intent to allow a cause of action for negligence will be lost."). The Carden court then determined that this duty question raised a genuine issue of material fact and concluded that it should be submitted to a jury. Likewise, when we frame the question with the requisite specificity, we also conclude that a reasonable jury might conclude that Daya's injuries were the result of negligence that is not characteristic of, intrinsic to, or an integral part horseback riding. We hold that material questions of disputed facts remain to be decided by a jury.
 
 
 50
 Here, as in Cooperman, we take no position on the contours of what evidence would be sufficient to demonstrate what is or what is not an inherent risk within the meaning of the WRSA. See 214 F.3d at 1169 ("Because under Wyoming law the question of what is an inherent risk is normally a question of fact for the jury, we do not attempt to set the parameters here as to what factual proof would take the risk ... outside the realm of an inherent risk.") Halpern, 890 P.2d at 566 (inviting a list of what might constitute an inherent risk). We further note that the Wyoming Supreme Court has not yet decided a case since the WRSA was amended. But applying the most recent statement by the Wyoming Supreme Court, Halpern, and a subsequent decision by this court, Cooperman, we hold that the district court improperly granted summary judgment.
 
 III. Conclusion
 
 51
 For the reasons set forth above, we REVERSE and REMAND the decision of the district court for further proceedings consistent with this decision.[2]
 
 
 
 Notes:
 
 
 [1]
 Although the plaintiffs allege that Ms. Ricks' failure to notify the parents of the accident as a distinct cause of action in their complaint, the district court failed to differentiate it in its opinion. We believe that if the plaintiffs had renewed this argument on appeal, it would probably require a separate analysis from the other claims falling under the WRSA
 
 
 [2]
 Appellants' motion entitled "Plaintiffs/Appellants' Motion to Certify Question of State Law" filed on August 22, 2002 is denied