**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 14 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CAMIE R. DUNBAR and DOUGLAS
DUNBAR,

      Plaintiffs - Appellants,

v.

JACKSON HOLE MOUNTAIN
RESORT CORPORATION, a
Wyoming Corporation,

      Defendant - Appellee.

No. 03-8057

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 02-CV-123D)**

---

Robert E. Schroth Sr. (Robert E. Schroth Jr. and W. Keith Goody, with him on the
briefs), Jackson, Wyoming, for Plaintiff-Appellant.

Mikel L. Moore (James K. Lubing, Jackson, Wyoming, with him on the brief),
Christensen, Moore, Cockrell, Cummings & Axelberg, P.C., Kalispell, Montana,
for Defendant-Appellee.

---

Before **SEYMOUR**, **HENRY**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

While skiing at the Jackson Hole Mountain Ski Resort, Camie Dunbar fell approximately twelve feet into a snowboard half-pipe, suffering severe injuries for which she alleges negligence on the part of Jackson Hole. At the time of her accident, Dunbar was attempting to exit a specially designated ski and snowboard terrain park. Finding that Jackson Hole did not owe Dunbar a duty of care for risks inherent to her chosen recreational activity under the Wyoming Recreational Safety Act, the district court granted summary judgment for the resort. Dunbar now appeals, arguing that the risks inherent to alpine skiing do not include the risk of falling into the side of a snowboard half-pipe when following a Jackson Hole employee's instructions on how to exit the terrain park. We exercise jurisdiction under 28 U.S.C. § 1291 and **REVERSE**.

**I**

In March 2001, Camie Dunbar suffered the stated injuries when she skied off a snow ledge in a specially designed "terrain park" at the Jackson Hole Mountain Resort in Jackson Hole, Wyoming. A 33-year-old self-described intermediate skier from South Florida, Dunbar skied into the terrain park area with other members of her group who were part of a promotional ski trip sponsored by her employer Clear Channel Communications.

Containing various man made features such as a table top jump and a snowboard half-pipe, the Jackson Hole terrain park is designed for advanced

skiers and snowboarders who choose to recreate in a very challenging risk-filled environment. The terrain park is separated by a fence and a boundary rope from an intermediate ski run. To enter the terrain park, skiers must pass through a gate marked with a warning sign, alerting them that they are entering an advanced ski area where "serious injuries, death, and equipment damage can occur." At the time of the accident, the terrain park had been relocated to its position in an intermediate ski run, and did not appear on the Resort's trail maps.

On the last day of her trip, Dunbar, along with Dave Dresher and Mike Jennings, went up the mountain intending to "investigate" the terrain park. In proceeding down an intermediate ski run, they skied through an initial gate providing a warning sign that they were entering a double black diamond "terrain feature trail." After stopping adjacent to a red tram car which served as the office for the "pipe and park" crew who were responsible for maintenance of the terrain park, Dunbar observed other skiers and snowboarders maneuver various features in the terrain park.

Based on their observations, Dunbar and her companions decided that they did not want to try any of the features. In her deposition, Dunbar attested to thinking "this is my last day [and] I want to go home in one piece." She stated that she did not know that there was a snowboard half-pipe in the terrain park, and believed instead that the area included only the jumps she observed from the

3

red gondola. There is no suggestion by either party that Dunbar intended to jump any of the terrain jumps or intended to try her hand at stunts as a skier in a snowboard half-pipe. Having decided that she did not want to ski any of the double-black diamond features, she asked a Jackson Hole employee how to exit that area "if you don't want to take this terrain park." She was told either to take off her skis and hike back to the gate through which she had entered or to proceed in the direction of a "catwalk" to which the employee pointed. Unbeknownst to Dunbar, the "catwalk" led to a side entrance to the snowboard half-pipe.

Ms. Dunbar along with her companions skied along the "catwalk." Although it is a matter of some dispute between the parties, in order to proceed down the catwalk, skiers had to pass warning signs indicating that they were approaching a snowboard half-pipe area. Both Dunbar and her companions claim not to have noticed the signs. Dunbar and Jennings went along the catwalk, up an incline, across a flat deck, and fell approximately twelve feet into the half-pipe. Jennings managed to maneuver his snowboard in such a way as to avoid injury. Dunbar was not so fortunate. As a consequence of her fall into the half-pipe, she suffered severe injuries to her pelvis and thigh requiring surgery and intensive physical therapy. Dunbar testified that she will neither be able to return to her pre-injury range of motion, nor will she be capable of having a natural childbirth as a result of the injury to her hip.

Asserting that Jackson Hole's negligence caused her injuries, Dunbar filed suit in district court. Jackson Hole filed a motion for summary judgment and a motion to strike portions of Dunbar's affidavits as attempts to create sham factual issues in order to survive summary judgment. The district court granted both motions for Jackson Hole on the basis that portions of Dunbar's affidavit were inconsistent with her deposition testimony. Dunbar now appeals.

## II

We review a grant of summary judgment de novo, applying the same legal standards as the district court pursuant to Fed. R. Civ. P. 56(c). Chickasaw Nation v. United States, 208 F.3d 871, 875 (10th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We must look carefully to determine if existing factual disputes are material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court may not grant summary judgment when "a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. When the moving party has

5

informed the district court of the basis for its motion, however, a nonmoving party may not stand merely on its pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (citing Fed.R.Civ.P. 56(e)). In our application of this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms v. Oklahoma ex rel. Department of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Furthermore, as a federal court sitting in diversity, we must ascertain the applicable Wyoming law as announced by the Wyoming Supreme Court so that the substantive law applied in federal court does not differ from what would apply in state court. Wood v. Eli Lilly & Co., 38 F.3d 510, 512 (10th Cir. 1994).

## A

To protect providers of recreational sports and activities from liability for alpine skiing, equine activities, and other outdoor pursuits in the state, the Wyoming legislature limited their duty of care by enacting the Wyoming Recreation Safety Act. Wyo. Stat. Ann. § 1-1-121 et. seq.; see Sapone v. Grand Targhee, Inc., 308 F.3d 1096, 1101 (10th Cir. 2002). As a matter of common law, in order to prevail in a negligence action, a plaintiff would first have to demonstrate that the defendant owed her a duty to act with reasonable care. See, e.g., Erpelding v. Lisek, 71 P.3d 754, 757 (Wyo. 2003). The Safety Act is

6

designed to limit the duty a provider of recreational sports and activities owes to participants.

Under the Safety Act, a provider of a recreational opportunity has no duty to protect participants from "inherent risks" of the particular sport or recreational opportunity. Wyo. Stat. Ann. § 1-1-123. In relevant part, the act provides:

> (a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

> (b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

§ 1-1-123. Wyoming defines inherent risks as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-122(a)(i). Wyoming further defines "Sport or recreational opportunity" as meaning "commonly understood sporting activities," which include "alpine skiing." § 1-1-122(a)(iii). Thus, for example, a provider of an alpine skiing opportunity will not be liable for a duty of care with regard to dangers that are "characteristic of" or "intrinsic to" or "an integral part" of the sport of alpine skiing. However, the act does provide for a cause of action based on the negligence of the recreational opportunity provider when the injury is not the result of an inherent risk of the sport or recreational opportunity:

7

"Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved. . . ." § 1-1-123(c). Thus, whether a recreation provider owes its patrons a duty of care depends entirely on whether the specific risks can be characterized as inherent to the sport or activity.

What is inherent to a sport or activity, however, is far from self-evident. In Sapone, we defined "inherent" under the Wyoming Safety Act as either "'those risks which are essential characteristics of a sport and those which participants desire to confront,' or they are undesirable risks which are simply a collateral part of the recreation activity." Sapone, 308 F.3d at 1103 (citation omitted). We have further defined a risk that is not inherent as "a risk that was atypical, uncharacteristic, [and] not intrinsic to the recreational activity. . . ." Id. at 1104. Although equine activities are among those the Wyoming legislature clearly meant to protect, and although horseback riding indubitably involves inherent risks, we have concluded, following the Wyoming Supreme Court, that not all risks of horseback riding are inherent risks. Cooperman v. David, 214 F.3d 1162, 1167 (10th Cir. 2000); Halpern v. Wheeldon, 890 P.2d 562, 566 (Wyo. 1995). Some risks may occur from the choices a recreation provider makes on behalf of the participant and from the conditions in which the recreational opportunity is provided. Thus, atypical or uncharacteristic risks can arise even in those specific

8

sports the Wyoming legislature clearly intended to exempt from liability for inherent risks. Following the Wyoming Supreme Court in <u>Halpern</u>, we have held that "where genuine issues of material fact exist, the determination of whether something is or is not an inherent risk is a factual question that must be sent to the jury for determination." <u>Sapone</u>, 308 F.3d at 1102.

As a preliminary matter, what sport or activity characterizes Camie Dunbar's behavior is a matter of considerable dispute. Most generally, she was engaged in alpine skiing – a sport clearly covered by the Safety Act. If we were to analyze the risk at this level of generality, then it would certainly appear that falling twelve feet into a trench in the middle of an intermediate ski-run would decidedly <u>not</u> constitute an inherent risk of alpine skiing. Such a level of generality, however, is not appropriate. To determine what risk is inherent to Dunbar's activity, we must go beyond a broad characterization and inquire into the specific circumstances of both her actions and those of the recreation provider.

When the <u>Cooperman</u> court examined the risks of horseback riding in the context of the specific facts of that case, for example, it employed a different analytical framework than if it had merely asked the abstract question whether falling off a horse is an inherent risk of horseback riding. <u>Cooperman</u>, 214 F.3d at 1167. Because a determination of what risks are inherent to a sport or activity

9

may change by descriptive differences, we have stated that "[w]hen attempting to determine whether a risk is inherent to a sport, we can not look at the risk in a vacuum, apart from the factual setting to which the [participant] was exposed." Cooperman, 214 F.3d at 1167. Instead, we must analyze the risk "at the greatest level of specificity permitted by the factual record." Id. As an example of this principle, we have explained:

> [I]f the only fact presented to the court is that the horse bucked while the rider was properly sitting on the horse, we would frame the duty question as whether a bucking horse is an inherent risk of horseback riding. However, if the facts established that the owner of the horse lit firecrackers next to the horse and the horse bucked, we would ask whether a horse bucking when firecrackers are lit next to the horse is an inherent risk of horseback riding.

Id.

For instance, in Cooperman, we determined that the risk of a slipping saddle, in light of the lack of scientific precision in hand cinching, is inherent to horseback riding. Id. at 1168. However, in Sapone, we concluded that a child sustaining injuries when falling from the saddle during a trail-riding lesson was not an inherent risk when there was evidence that the horse was too large, that the instructions were inadequate, that no headgear was provided, and that the route was too dangerous. Sapone, 308 F.3d at 1104. Similarly, in Madsen v. Wyoming River Trips, Inc., 31 F. Supp. 2d 1321, 1329 (D. Wyo. 1999), the district court determined that the risks inherent to white-water rafting did not include risks of

10

injury resulting from the recreation provider's overcrowding the boat. See also Carden v. Kelly, 175 F.Supp. 2d. 1318, 1329 (2001) (finding a genuine issue of material fact whether, given the actions and inactions of the recreation provider, a horse's stumbling and falling was an inherent risk of horseback riding).

In the present case, the district court's order hinged on a determination of where Ms. Dunbar was located when she made her choice to proceed down the catwalk. Thus, not simply a question of alpine skiing, but of alpine skiing in a designated terrain park became the significant "factual setting" the district court used to examine the inherent risks to which Dunbar was exposed.

In its order granting Jackson Hole's motion for summary judgment, the district court stressed, and Jackson Hole urges on appeal, the need to focus on the choices that Dunbar made when entering the terrain park. Reasoning that an inherent risk analysis could not properly be conducted without considering Dunbar's choices, the district court focused on the facts of Dunbar's conduct as the recreational participant. Central to the district court's determination of inherent risk was the simple fact of Dunbar's choice to enter the terrain park. The court found that "a terrain feature such as a half-pipe located within a fenced terrain park is an inherent risk to a skier that voluntarily and knowingly enters that park." Dunbar v. Jackson Hole, No. 02-CV-123-D, slip op. at 14-15 (D. Wyo. June 16, 2003). Furthermore, the court concludes that having entered the

11

terrain park, Dunbar "decided to enter the [metaphorical] 'rodeo' and thus assumed the risk associated with that activity." Id. at 15. We disagree.

First, we note that the plain language of the Safety Act focuses on "[a]ny person who takes part in any sport or recreational opportunity," Wyo. Stat. Ann. § 1-1-123, and does not mention the location of the sport or activity. We fail to see how simply being present in the terrain park redefines the sport or activity in which Dunbar is engaged, especially absent further choices to take part in any of the terrain park features. No doubt location may have a bearing on how to characterize a participant's activity, but it is not automatically determinative as the district court suggests.[1] Indeed, from the record, it is not clear whether the double black diamond designation applied to the area of the intermediate ski run from the putative entrance to the terrain park to the red tram car and from the tram car to the catwalk. There seems to be no dispute that in the areas Dunbar traversed a skier would not confront any unusual risks or features that differed from those elsewhere on the intermediate ski run (at least until the point where

_____

[1] As to the issue of whether or not Dunbar had actually entered the park, we note that the district court is itself not descriptively clear, stating at one point that "she had misgivings about entering and asked a JHMR employee how to get out of the terrain park." Dunbar, slip op. at 13. Of course, if she had not "entered" she could not ask how to "get out." We conclude from this only that mere presence in the terrain park may be too fine a reed to hang a determination that Dunbar was engaged in a categorically different recreational activity which contained greater inherent risks than does ordinary alpine skiing.

12

Dunbar fell into the half-pipe). Thus it would seem to be an open question whether the warning signs and double black designation properly applied to the area that Dunbar actually traversed or if they were limited to the physical space containing the dangerous terrain features. If the double black diamond designation applies only to the specific terrain features and if the warnings apply only to those skiers and snowboarders who attempt to maneuver over and among the trail features down the fall line of the mountain, then it may be difficult to conclude that Dunbar assumed a double black diamond risk simply by skiing across the fall line on an intermediate slope to the tram car and then proceeding, as directed, by way of the catwalk. Proper resolution of these factual questions concerning the impact of Dunbar's specific location on Jackson Hole's duty, however, are for a jury, not for the court, to decide.

Second, we conclude that there is a difference between the consequences of conduct chosen by Dunbar, and risks that are inherent to that choice. It does not necessarily follow, as the district court finds, that having entered the terrain park, Dunbar also chose to confront all the features and conditions present within it. Although the district court emphasized the choices and conduct of the plaintiff in determining what risks she assumed, the court makes no distinction between the risks that are inherent to her actual choices – to ski into the terrain park area, but not to "take" any of the features – and risks that are inherent to choices one would

13

make when actually intending to ski over the specific features.

Indeed, a reasonable person who entered the general area of the terrain park would stop first to view the features and decide whether or not to attempt to maneuver over or through any of them. In fact, Jackson Hole's warning signs, the presence of which figure prominently in this dispute, direct skiers and snowboarders to "please observe terrain features, their risks, and their degree of difficulty before using." That is precisely what Ms. Dunbar did. She chose to enter the area of the terrain park – if not the terrain park itself – but specifically chose not to "use" or "take" any of the terrain park features after doing exactly what Jackson Hole's signs advised her to do: "observe . . . before using." Presumably, Jackson Hole does not wish to claim that it operates like the Hotel California – where you can check in any time you like but you can never leave. Accordingly, it was error for the district court to conclude that having followed Jackson Hole's instructions, having assessed the risks and decided not to use the terrain features, that there is no material issue of fact concerning whether a skier could leave without accruing those very risks. Having "entered" the terrain park, Dunbar did not "use" the terrain park as a terrain park—viz., she did not attempt to jump the table top jump nor did she attempt to do stunts in the snowboard half-pipe. She attempted to exit the terrain park without "taking" any of the features, and followed instructions from a Jackson Hole employee on how to exit the park.

14

Given the specific factual setting of this case, what risks are associated with Dunbar's actual choices and what duty Jackson Hole owed her are properly questions for the jury.

Accordingly, we conclude that the district court erred when it found that the risk of falling twelve feet into a snowboard half-pipe was an inherent risk of Dunbar's alpine skiing when she had stopped and observed double diamond terrain features and had chosen not to "take" those features. When, as is here, genuine issues of material fact exist, it is properly a question for the jury to determine whether dangers that are "characteristic of" or "intrinsic to" or "an integral part" of the sport of alpine skiing evaluated under the specific factual circumstances of this case include those encountered by Dunbar in skiing from the main intermediate run to the tram car and from the tram car along the catwalk. Sapone, 308 F.3d at 1102 ("whether something is or is not an inherent risk is a factual question that must be sent to the jury for determination"); see also, Dillworth v. Gambardella, 970 F.2d 1113, 1123 (2d Cir. 1992) (holding under a Vermont statute similar to Wyoming's, that determination of inherent danger "is a question of fact properly submitted to the jury").

## B

As we have observed, inquiry into what dangers constitute an inherent risk under the Safety Act is inextricably intertwined with an inquiry into what duty the

15

recreation provider owes to the participant, and whether that question is properly one for the judge or jury. If Dunbar's accident was not the product of an inherent risk of her recreational activity, then a question remains for the fact finder concerning what duty was owed her and whether Jackson Hole fulfilled that duty. We conclude that the district court improperly analyzed the issue of Jackson Hole's duty.

When the issue of duty involves questions of fact, as is the case with "inherent risks," the Wyoming Supreme Court has held that the question of a defendant's duty should be resolved by a jury. Halpern, 890 P.2d at 565. However, in certain instances where no material questions of fact exist – e.g., if the risk is clearly one inherent to the sport – the district court may decide as a matter of law that a provider does not owe a duty to the participant under the Safety Act. Halpern, 890 P.2d at 566 (noting that "[i]n appropriate cases where no genuine issues of material fact exist, the district court may decide as a matter of law that the provider does not owe a duty to the participant."). Such was not the case here.

How the district court framed the statement of Jackson Hole's duty is crucial to a proper disposition of this case. It has become something of a standard analysis in this line of cases for a district court to frame the question of duty, in addition to the question of inherent risk, in the form of a fact-specific inquiry.

16

Indeed, as the district court noted in another Safety Act case, "[t]he Court cannot stress how important it is to frame the duty question correctly. If the duty question is framed incorrectly, the legislature's intent to allow a cause of action for negligence will be lost." Madsen, 31 F. Supp. 2d. at 1329.

In the present case, the district court framed the question of duty as follows:

> [W]hether Camie Dunbar's injuries occurred as a result of the inherent risk of alpine skiing when this thirty-three year-old experienced skier knowingly entered a specially designated terrain park, skied past five warning signs, made the choice not to exit by way of the gate she entered understanding that she would encounter expert and double expert terrain features, skied up the visible half-pipe wall, and across a fourteen-foot platform.

Dunbar, slip op. at 14. We have already concluded that Dunbar's mere presence in the entrance area of the terrain park does not give rise as a matter of law to a heightened risk above what is normal to alpine skiing. We now conclude that the question of Jackson Hole's duty was improperly framed because it employs facts in dispute, and does not view the facts in the light most favorable to the non-moving party.

Specifically, the district court's finding that Dunbar chose not to exit the terrain park area via the gate by which she entered understanding that she would encounter expert and double expert terrain features is itself a fact open to dispute. Whether or not her choice was made with that understanding is a disputed fact,

17

and read in the light most favorable to the plaintiff, the district court improperly incorporated a disputed fact in a light favoring the defendant. Second, the district court frames the duty question by stating that Dunbar "skied up the visible half-pipe wall." Id. Whether or not what she skied up was in fact visibly a half-pipe wall is itself a disputed fact, and inclusion of this fact in a light most favorable to the defendant was improper. Finally, the district court states that Dunbar "skied past five warning signs," which although perhaps true (though contested), shades the "duty question" in a way that ignores the factual issues of the content and import of each of those signs in the context of the Jackson Hole employee's instructions on how to exit the park. Given the fact that we have previously held that the question of a provider's duty is partially determined by a fact-specific framing of inherent risk, we conclude that the district court erred in making factual findings that are properly findings for a jury. See Sapone, 308 F.3d at 1102.

Finally, we note that whatever risks Dunbar assumed herself, it seems clear that she did not also assume the risk of needing to interpret the delphic statements of Jackson Hole's employees. Both Jackson Hole and the district court focus on the issue of choices that Dunbar made, ignoring the choice that Jackson Hole made for her in directing her to exit the terrain park area by either hiking out the main entrance or skiing along the catwalk. We have made clear that a duty of

18

care may arise from choices made for the participant by the recreation provider. Sapone, 308 F.3d at 1104; see also, Madsen, 31 F. Supp. 2d at 1328-29; Carden, 175 F.Supp. 2d. at 1328-29. Absent from the district court's order is any recognition that once Dunbar asked a Jackson Hole employee how to exit the terrain park area without "taking" any of the features, Jackson Hole owed a duty to provide her with appropriate instructions, which might have included a specific warning to beware of the drop into the half-pipe at the end of the catwalk. Whether or not they fulfilled that duty is a question for the jury. Accordingly, the district court erred when it framed the question of Jackson Hole's duty by incorporating facts in dispute and when it failed to submit the question of duty to the fact finder pursuant to Wyoming Supreme Court precedent.

On appeal, Dunbar also raises as error the district court's granting Jackson Hole's motion to strike portions of her affidavit as creating sham factual issues to survive summary judgment. Those supposed sham facts dealt with Dunbar's understanding of whether she had entered the actual terrain park (the area including the jumps) when located at the tram car. Because we conclude that summary judgment was inappropriate, the issue of Dunbar's affidavit is now moot.

## III

For the reasons set forth above, we **REVERSE** the district court and

19

**REMAND** for further proceedings consistent with this opinion.