2012 WY 124

**James CREEL and Brenda Creel,**
**Appellants (Plaintiffs),**

**v.**

**L & L, INC., a Wyoming Corporation,**
**Lew Lepore and Mike Lepore,**
**Appellees (Defendants).**

**No. S–11–0138.**

Supreme Court of Wyoming.

Sept. 14, 2012.

Representing Appellants: Richard Gage of Richard Gage, PC, Cheyenne, Wyoming.

Representing Appellees: Grant R. Curry and Monty L. Barnett of White & Steele, P.C., Cheyenne, Wyoming, and Denver, Colorado. Argument by Mr. Barnett.

Before GOLDEN, and VOIGT, JJ., and SULLINS, BROOKS, and TYLER, DJJ.

GOLDEN, Justice.

[¶ 1] James Creel and Brenda Creel (collectively the Creels) attended the 2006 Wyoming Open Golf Tournament (Wyoming Open) as spectators. During the tournament, James Creel (Mr. Creel) was struck by a golf ball and suffered a head injury. The Creels thereafter filed an action for damages against several parties, including the golfer who hit the ball, a tournament official, and the operators of the golf course and tournament—L & L, Inc. and its owners Lew Lepore and Mike Lepore (collectively L & L). The district court granted summary judgment in favor of all defendants except the golfer, concluding that getting hit by a golf ball is an inherent risk of golf and that the Wyoming Recreation Safety Act thus barred the Creels' action. The Creels appeal the summary judgment entered in favor of L & L. We reverse.

## ISSUES

[¶ 2] The Creels present the following issues on appeal:

1. Does the "Recreation[ ] Safety Act," Wyoming Statute § 1–1–121 through § 1–1–123, shield a provider of a recreational opportunity from liability when the provider fails to provide a safe environment for that recreational opportunity?

2. Does the "Recreation[ ] Safety Act," Wyoming Statute § 1–1–121 through § 1–1–123, shield a provider of a recreational opportunity from liability when the negligence of the provider increases the dangers to spectators at that recreational opportunity?

## FACTS

[¶ 3] In reviewing a summary judgment, we set forth the underlying facts consistent with our standard of review, which requires that we proceed as follows:

We treat the summary judgment movant's motion as though it has been presented originally to us. We use the same materials in the record that was before the district court. Using the materials in the record, we examine them from the vantage point most favorable to the nonmoving party opposing the motion, giving that party the benefit of all favorable inferences which may fairly be drawn from the materials.

*Bangs v. Schroth,* 2009 WY 20, ¶ 20, 201 P.3d 442, 452 (Wyo.2009) (citations omitted).

[¶ 4] On July 7, 2006, the Creels attended the 2006 Wyoming Open at the Cheyenne Airport Golf Course in Cheyenne, Wyoming. They walked the course following their son, Josh Creel, who was competing in the event. Josh Creel's foursome included fellow golfer Brandon Donahue, and his caddy was Haley Hartman. The spectators following Josh Creel, besides his parents, included Hadley Berry and Sue Blythe. When Josh Creel reached the putting green of Hole # 1, they and others watched him from the front-right side of the green. Hole # 1 is straight, roughly 320 to 330 yards long, and the right

side of its fairway is lined with scattered trees and bushes.

[¶ 5] While the Creels and others watched their son putt, the next group of competitors prepared to tee off from the tee box of Hole # 1. That group included Brett Veesart (Mr. Veesart), a professional golfer. Those on the tee box of Hole # 1, including Mr. Veesart, could see the golfers still on the putting green of Hole # 1. Mr. Veesart and the others in his group testified that the spectators following the Creel foursome ahead of them were not visible from the tee box of Hole # 1, while Josh Creel and another golfer in his foursome testified that the spectators were standing in a location that was visible from the tee box.

[¶ 6] Kathy Irvine (Ms. Irvine) was a volunteer "starter" at Hole # 1. She was appointed by and performing at the direction of L & L, which operates the course and sponsored the tournament. At the time of the 2006 Wyoming Open, Ms. Irvine had worked as a starter at the tournament for approximately twenty-four years.

[¶ 7] Mr. Veesart was designated as the first player off the tee box, and Ms. Irvine instructed him to commence play. Mr. Veesart responded that he felt he should wait because he was concerned that he could hit the green with his initial drive. He testified:

Q.  And do you remember the starter that day?

A.  Yes.

Q.  Do you remember a discussion that you had with her?

A.  Yes.

Q.  And do you remember discussing with her the fact that there were people on the green?

A.  Yes.

Q.  And do you remember discussing with her the fact that you felt as though you could hit that green with your drive?

A.  Yes.

Q.  And what was her response to you?

A.  That the wind was swirling and that they were behind and we needed to get going.

Q.  And how did you interpret that?

A.  That she was basically saying you need—that we need to get going.

Q.  That she was instructing you to hit?

A.  Mm-hum.

Q.  Regardless of whether or not people were on the green?

A.  Yes.

Q.  Did she dispute the possibility that you could hit that green—

A.  Yes.

Q.—on your drive? Did you tell her that you could hit that green with your drive?

A.  I told her that I could knock it on that green.

Q.  And she said everybody thinks that?

A.  I don't know if those were her exact words, but along those lines.

Q.  But she, nonetheless, instructed you to hit?

A.  Yes.

Q.  Were you reluctant to do that?

A.  I told her I cannot hit.

Q.  And she said hit anyway?

A.  Yes.

[¶ 8] Mr. Veesart proceeded as Ms. Irvine directed and teed off Hole # 1. Mr. Veesart pushed his tee shot to the right of the green but did not yell "fore." The tee shot struck Mr. Creel on the side of his head, and he fell to the ground. Josh Creel then ran down the fairway alerting the Veesart foursome that his father had been hit and calling for an ambulance. Mr. Veesart went to Mr. Creel's side and said, "I'm so sorry. She made me hit." He also told the Creels that he would have been disqualified had he not hit the ball. We shall provide pertinent additional facts in our discussion below.

[¶ 9] In March of 2009, the Creels filed a complaint that named Mr. Veesart as the sole defendant. The complaint alleged that Mr. Veesart negligently caused the ball to be struck and negligently failed to warn the golfers and spectators within range of the incoming golf ball. Subsequently, the Creels amended the complaint to add Ms. Irvine and L & L as defendants. The amended com-

plaint alleged negligence on the part of Ms. Irvine for directing Mr. Veesart to hit his drive and for failing to warn the golfers and spectators, and negligence by L & L for failing to adequately train Ms. Irvine. In January of 2010, the complaint was amended a second time, and the second amended complaint added Lew Lepore and Mike Lepore as individual defendants, with it being asserted that they were engaged in the management and supervision of the golf tournament.

[¶ 10] L & L moved for summary judgment on the ground that getting hit by a golf ball is an inherent risk of playing or being a spectator at a golf tournament and that the Wyoming Recreation Safety Act thus barred the Creels' claims. Ms. Irvine separately moved for summary judgment, asserting that, as a voluntary starter at the Wyoming Open, she did not owe the Creels any legal duty of care. Finally, Mr. Veesart moved for summary judgment on the ground that he had no duty either to protect participants and spectators from the inherent risks of golf or to warn such individuals of those inherent risks.

[¶ 11] In opposition to the summary judgment motion of L & L, the Creels argued: (a) there were genuine issues of material fact concerning whether the golf tournament was being negligently run by failing to properly mark safe observation areas for the tournament spectators; (b) the injuries sustained by Mr. Creel were not the result of inherent risks to the game of golf, rendering the Recreation Safety Act inapplicable; and (c) Mr. Creel was a spectator at the tournament and not a participant as contemplated by the Recreation Safety Act. In response to Kathy Irvine's motion for summary judgment, the Creels responded: (a) Ms. Irvine owed a duty of care to the Creels both in her individual capacity, as well as in her capacity as an agent for L & L; and (b) material issues of fact were in dispute concerning the existence of the agency relationship as well as whether a legal duty existed. Finally, responding to the motion for summary judgment of Mr. Veesart, the Creels asserted that the Recreation Safety Act should not bar the pending claims against him because the Act does not immunize a participant from acting recklessly and negligently during the course of play.

[¶ 12] The district court granted summary judgment to all of the defendants except Mr. Veesart. In granting summary judgment the court found, in part:

The main crux of both the primary assumption of risk doctrine and the WRSA is the absence of a duty to protect from risks *inherent* in a sporting activity. This Court finds the WRSA to be in essence a legislative adoption of the common law principle. *See Hal[p]ern v. Wheeldon,* 890 P.2d 562 (Wyo.1995) (suggesting that the WRSA embodies the principle of primary assumption of risk, which limits duty, rather than secondary assumption of risk, which is an affirmative defense to breach of duty and was abolished in Wyoming by the comparative negligence statute, W.S. § 1–1–109).

The WRSA removes a duty to protect from inherent risks of a sport, but it does not bar recovery for all risks. *Walters v. Grand Teton Crest Outfitters, Inc.,* 804 F.Supp. 1442, 1445 (D.Wyo.1992). Relating to the primary assumption of risk doctrine, several jurisdictions note that there is a duty to not increase the inherent risks of a sport. *See e.g. Cotty v. Town of Southampton,* 64 A.D.3d 251, 254, 880 N.Y.S.2d 656 (N.Y.A.D. 2 Dept.2009); *Levinson v. Owens,* 176 Cal.App.4th 1534, 1543, 98 Cal.Rptr.3d 779 (Cal.App. 3 Dist. 2009); *Yoneda v. Tom,* 110 Hawai'i 367, 133 P.3d 796, 810 (Hawaii 2006). Similarly, duty is not limited wholesale against intentional or reckless conduct. *See Shinn [Shin] v. Ahn,* 42 Cal.4th 482, 64 Cal. Rptr.3d 803, 165 P.3d 581, 589 (Cal.2007) (discussing that Ohio, New Jersey, Massachusetts, Texas, and Hawaii have all applied reckless disregard or intentional conduct standards to golf, and adopting a similar rule in California); *Yoneda, supra* at 380–81 [133 P.3d 796]. These standards appear to be in accords with the WRSA, at least to the extent that an affirmative act that increases risk, is reckless or is an intentional tort is not necessarily "intrinsic to" or "an integral part of" most sports. W.S. § 1–1–122(a)(i).

Turning to the facts of this case, it is important to note that the 2006 Wyoming Open was not a large professional tournament which drew an enormous number of spectators like one might see during a televised PGA event. The record suggests that spectators generally came to observe a golfer with whom they had a personal relationship. Mr. Creel came to observe his son, and Veesart's father was similarly following him. It does not appear that any crowd control measures were taken under these circumstances, but rather spectators were free to travel the course at their own leisure. This case is not akin to others which have involved questions of whether crowd control measures increased the risks of being hit. *See Duffy, supra; Baker, supra.* Instead, spectators traveled the course with their respective golfer, and the risks which they faced were essentially the same faced by the competitors.

Mr. Creel was well aware of these risks. He is a member of the Cheyenne Country Club and plays golf regularly with his wife. Sometimes he plays as a part of his job and he often plays in tournaments himself.

The Creels' central argument is that Irvine induced Veesart into hitting the ball when it was not safe to do so, and that the Lepores were negligent in not adequately training Irvine in her duties as a starter....

While the Lepores and Irvine may have had an obligation to not increase the inherent risks present on the golf course, the Plaintiffs must live with the downside of this duty. By stepping on the golf course, Mr. Creel assumed the risk that a ball might fly where a golfer did not intend, and that he could be the unfortunate victim of such an occurrence. Indeed, there is ample authority that the risk of being hit by an errant shot is inherent in the game of golf. *See e.g. Sanchez v. Candia Woods Golf Links* [161 N.H. 201, 13 A.3d 268], 2010 WL 4781478, *2–3 (N.H.2010); *Anand v. Kapoor,* 61 A.D.3d 787, 790–91, 877 N.Y.S.2d 425 (N.Y.A.D. 2 Dept.2009); *Shin,* 64 Cal.Rptr.3d 803, 165 P.3d at 587; *Yoneda,* 133 P.3d at 808. The Lepores and Irvine had the same degree of control over the direction of Veesart's ball as they

did the weather on the day of the tournament. It goes without saying that there is never a duty to control the uncontrollable.

\* \* \* \*

The Court must admit that if Irvine did have the ability to influence Veesart into hitting an unsafe shot, and that if such influence could be shown to have increased the inherent risk that spectators would be hit, then perhaps genuine issues of fact suitable for trial might exist. However, every person who is familiar with the rules of golf whose testimony is present in the record agrees that the golfer has the ultimate responsibility of determining when he or she can safely hit. Veesart is an assistant golf professional at the White Mountain Country Club in Rock Springs, Wyoming, where he has worked since 2005. He has been an apprentice PGA professional since the spring of 2006. There is no doubt that he knows the rules of the game well. While he testified he feared being penalized if he did not comply with Irvine's alleged orders, he also admitted that he knew at the time he could have sought the assistance of a rules official to settle any dispute. In the end, there is simply no evidence that suggests Irvine had any authority or ability to direct Veesart to hit a dangerous shot.

\* \* \* \*

Ultimately, reasonable minds cannot differ that getting hit by an off-line or errant golf shot is an inherent risk of playing and watching golf. Mr. Creel assumed the risk of such an occurrence. Neither Irvine, the Lepores and/or L & L had a duty to eliminate, alter or control that risk. As a result, summary judgment based on the undisputed facts is appropriate.

[¶ 13] Shortly after the district court entered its order granting summary judgment to L & L and Ms. Irvine, the court entered an order denying Mr. Veesart's summary judgment motion. The court denied Mr. Veesart's motion on the ground that a participant in a sport or recreational opportunity owes a duty to not increase the risks inherent in the activity and questions of fact remained as to whether Mr. Veesart's conduct

had increased the inherent risk to Mr. Creel. The denial of Mr. Veesart's summary judgment motion was not an appealable order and is therefore not before this Court. The summary judgment in favor of Ms. Irvine in her individual capacity is likewise not before this Court as the Creels settled and dismissed those claims against Ms. Irvine.

## STANDARD OF REVIEW

[¶ 14] Motions for summary judgment come before the trial court pursuant to Rule 56(c) of the Wyoming Rules of Civil Procedure, which provides that

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Redco Const. v. Profile Properties, LLC,* 2012 WY 24, ¶ 21, 271 P.3d 408, 414 (Wyo.2012) (quoting *Formisano v. Gaston,* 2011 WY 8, ¶ 3, 246 P.3d 286, 288 (Wyo.2011)). We review a grant of summary judgment following a well-established procedure:

> We review a summary judgment in the same light as the district court, using the same materials and following the same standards. [*Snyder v. Lovercheck,* 992 P.2d 1079, 1083 (Wyo.1999)]; *40 North Corp. v. Morrell,* 964 P.2d 423, 426 (Wyo. 1998). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.* If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine issue of a material fact for trial. *Roberts v. Klinkosh,* 986 P.2d 153, 155 (Wyo.1999); *Downen v. Sinclair Oil Corp.,* 887 P.2d

515, 519 (Wyo.1994). We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling. *Roberts v. Klinkosh,* 986 P.2d at 156; *Blagrove v. JB Mechanical, Inc.,* 934 P.2d 1273, 1275 (Wyo.1997).

*Lindsey v. Harriet,* 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo.2011).

## DISCUSSION

### A. Inherent Risk Analysis under the Wyoming Recreation Safety Act

[¶ 15] The Wyoming Recreation Safety Act bars actions against the provider of a sport or recreational opportunity for any injury caused by a risk that is inherent to that activity. The Act provides, in pertinent part:

> (a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

> (b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

Wyo. Stat. Ann. § 1–1–123 (LexisNexis 2011).

[¶ 16] On appeal, the Creels do not dispute that golf is a sport covered by the Recreation Safety Act, that L & L is a "provider" under the Act, or that the Creels are covered by the Act as persons taking part in a sport or recreational opportunity. The Creels instead contest the district court's conclusion that there is no disputed issue of material fact as to whether it was an inherent risk of golf that caused Mr. Creel's head injury.

[¶ 17] The Act defines inherent risk to mean "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1–1–122(a)(i) (Lexis-

Nexis 2011). What constitutes an "inherent risk" in a given set of circumstances is a variable that the Wyoming Legislature included in the statute by design. *Muller v. Jackson Hole Mtn. Resort,* 2006 WY 100, ¶ 13, 139 P.3d 1162, 1166 (Wyo.2006). The Tenth Circuit Court of Appeals interpreted the term "inherent risk," as used in the Wyoming Act, to mean the following:

> What is inherent to a sport or activity, however, is far from self-evident. In *Sapone,* we defined "inherent" under the Wyoming Safety Act as either " 'those risks which are essential characteristics of a sport and those which participants desire to confront,' or they are undesirable risks which are simply a collateral part of the recreation activity." *Sapone* [*v. Grand Targhee, Inc.*], 308 F.3d [1096,] 1103 [ (10th Cir.2002) ] (citation omitted). We have further defined a risk that is not inherent as "a risk that was atypical, uncharacteristic, [and] not intrinsic to the recreational activity.... " *Id.* at 1104. Although equine activities are among those the Wyoming legislature clearly meant to protect, and although horseback riding indubitably involves inherent risks, we have concluded, following the Wyoming Supreme Court, that not all risks of horseback riding are inherent risks. *Cooperman v. David,* 214 F.3d 1162, 1167 (10th Cir.2000); *Halpern v. Wheeldon,* 890 P.2d 562, 566 (Wyo.1995). *Some risks may occur from the choices a recreation provider makes on behalf of the participant and from the conditions in which the recreational opportunity is provided. Thus, atypical or uncharacteristic risks can arise even in those specific sports the Wyoming legislature clearly intended to exempt from liability for inherent risks.*

*Dunbar v. Jackson Hole Mtn. Resort Corp.,* 392 F.3d 1145, 1148–49 (10th Cir.2004) (emphasis added).

[¶ 18] "[T]he 'intent behind the Recreation Safety Act was not to preclude parties from suing for a provider's negligence, it was merely to stop people from suing providers for those risks that were inherent to a sport.' " *Carden v. Kelly,* 175

F.Supp.2d 1318, 1328 (D.Wyo.2001) (quoting *Madsen v. Wyoming River Trips, Inc.,* 31 F.Supp.2d 1321, 1328 (D.Wyo.1999)); *see also* Wyo. Stat. Ann. § 1–1–123(c) (LexisNexis 2011) ("Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved pursuant to W.S. 1–1–109."). Because of this distinction, courts interpreting and applying the Wyoming Recreation Safety Act have repeatedly cautioned against evaluating whether a risk is inherent to an activity without considering the specific facts surrounding the claimed injury. *See Dunbar,* 392 F.3d at 1149; *Carden,* 175 F.Supp.2d at 1328; *Cooperman v. David,* 214 F.3d 1162, 1167 (10th Cir.2000); *Madsen,* 31 F.Supp.2d at 1328; *Halpern v. Wheeldon,* 890 P.2d 562, 566 (Wyo.1995). "When attempting to determine whether a risk is inherent to a sport, we cannot look at the risk in a vacuum, apart from the factual setting to which the [participant] was exposed. And, we must evaluate the risk at the greatest level of specificity permitted by the factual record." *Cooperman,* 214 F.3d at 1167 (citing *Madsen,* 31 F.Supp.2d at 1328). The Tenth Circuit in *Cooperman* went on to explain:

> In determining whether a certain risk is inherent to a sport, we are taken to the level of specificity that the facts support. While at some level all sports have inherent risks, as we add in the facts of a specific risk encountered the risk may or may not be inherent. "Thus, the duty question is best resolved by framing the question correctly." *Madsen,* 31 F.Supp.2d at 1328.

*Cooperman,* 214 F.3d at 1167 (footnote omitted).

[¶ 19] The Tenth Circuit's decision in *Dunbar* illustrates the level of specificity required in determining whether an injury was caused by an inherent risk of a sport or recreational activity. In that case, Dunbar, an intermediate-level skier, left an intermediate ski run and entered a terrain park set up with jumps and other challenging features. *Dunbar,* 392 F.3d at 1146–47. Dunbar entered the terrain park with her companions to see whether it was something she would

like to ski, but upon examination she determined it was beyond her skill level and attempted to exit the park via a designated catwalk. *Id.* at 1147. While following the catwalk, Dunbar fell twelve feet into a "half-pipe" and suffered serious injuries. *Id.* Dunbar then filed an action against the ski area, and the district court granted the defendant summary judgment on the ground that Dunbar's injuries were caused by an inherent risk of her decision to enter the terrain park. *Id.* at 1150. The Tenth Circuit found genuine issues of material fact existed as to the inherent risk question and reversed, explaining:

> As a preliminary matter, what sport or activity characterizes Camie Dunbar's behavior is a matter of considerable dispute. Most generally, she was engaged in alpine skiing—a sport clearly covered by the Safety Act. If we were to analyze the risk at this level of generality, then it would certainly appear that falling twelve feet into a trench in the middle of an intermediate ski-run would decidedly *not* constitute an inherent risk of alpine skiing. Such a level of generality, however, is not appropriate. To determine what risk is inherent to Dunbar's activity, we must go beyond a broad characterization and inquire into the specific circumstances of both her actions and those of the recreation provider.
>
> \* \* \* \*
>
> ... It does not necessarily follow, as the district court finds, that having entered the terrain park, Dunbar also chose to confront all the features and conditions present within it. Although the district court emphasized the choices and conduct of the plaintiff in determining what risks she assumed, the court makes no distinction between the risks that are inherent to her actual choices—to ski into the terrain park area, but not to "take" any of the features—and risks that are inherent to choices one would make when actually intending to ski over the specific features.
>
> Indeed, a reasonable person who entered the general area of the terrain park would stop first to view the features and decide whether or not to attempt to maneuver over or through any of them. In

fact, Jackson Hole's warning signs, the presence of which figure prominently in this dispute, direct skiers and snowboarders to "please observe terrain features, their risks, and their degree of difficulty before using." That is precisely what Ms. Dunbar did. She chose to enter the area of the terrain park—if not the terrain park itself—but specifically chose not to "use" or "take" any of the terrain park features after doing exactly what Jackson Hole's signs advised her to do: "observe ... before using." Presumably, Jackson Hole does not wish to claim that it operates like the Hotel California—where you can check in any time you like but you can never leave. Accordingly, it was error for the district court to conclude that having followed Jackson Hole's instructions, having assessed the risks and decided not to use the terrain features, that there is no material issue of fact concerning whether a skier could leave without accruing those very risks. Having "entered" the terrain park, Dunbar did not "use" the terrain park as a terrain park—viz., she did not attempt to jump the table top jump nor did she attempt to do stunts in the snowboard half-pipe. She attempted to exit the terrain park without "taking" any of the features, and followed instructions from a Jackson Hole employee on how to exit the park. Given the specific factual setting of this case, what risks are associated with Dunbar's actual choices and what duty Jackson Hole owed her are properly questions for the jury.

> Accordingly, we conclude that the district court erred when it found that the risk of falling twelve feet into a snowboard half-pipe was an inherent risk of Dunbar's alpine skiing when she had stopped and observed double diamond terrain features and had chosen not to "take" those features. When, as is here, genuine issues of material fact exist, it is properly a question for the jury to determine whether dangers that are "characteristic of" or "intrinsic to" or "an integral part" of the sport of alpine skiing evaluated under the specific factual circumstances of this case include those encountered by Dunbar in skiing from the

main intermediate run to the tram car and from the tram car along the catwalk. *Dunbar*, 392 F.3d at 1149, 1151–52.

■ [¶ 20] The level of factual specificity required to establish an inherent risk will often but not always preclude summary judgment on the duty question. For example, in *Cooperman*, the Tenth Circuit demanded greater specificity in defining the inherent risk but nonetheless affirmed the district court's grant of summary judgment. In *Cooperman*, the plaintiff, Cooperman, went on a guided horseback ride and fell off his horse and suffered injuries when his saddle slipped. *Cooperman*, 214 F.3d at 1164. Cooperman sued the guide, and the district court granted the guide summary judgment after finding that a slipping saddle is an inherent risk of horseback riding. *Id.* In upholding the summary judgment, the court explained:

> The Coopermans' own expert testified that saddles slip for a variety of reasons including: stretching leather, the tensing or relaxing of a horse, the horse losing weight from sweat, the compression of certain types of saddle pads and loosening of the cinch due to the movement of the horse, or the rider failing to ride straight in the saddle. The expert further stated that a slipping saddle is always a possibility when horseback riding; that this was not the first time a saddle had slipped and it would not be the last. This evidence clearly indicates that a slipping saddle is an undesirable risk which is simply a collateral part of horseback riding. *Cf.* Hansen–Stamp, [Recreational Injuries and] Inherent Risks, [33 Land & Water L.Rev. 249] at 271 [1998]. Thus, a slipping saddle, with no other facts provided, is an inherent risk of horseback riding.

This case, however, presents facts which take us to a greater degree of specificity than simply stating that the saddle slipped. Thus we must take the analysis one step further. The Coopermans presented evidence that after Dr. Cooperman fell off the horse, his saddle was hanging loosely under the belly of the horse. One of WRT's employees testified that "if the saddle just fell off and was hanging loosely under the belly, then obviously the saddle wasn't tightened enough." *For purposes of summary judgment, then, the issue is whether a slipping saddle that is loosely cinched is an inherent risk of horseback riding.*

As discussed above, it is inherent that a saddle will slip, and the plaintiffs' expert testified that saddles will slip for a variety of reasons. The expert also testified that although there are dangers in cinching the saddle too loosely, there are also dangers in cinching the saddle too tightly. For example, if a saddle is cinched too tightly the expert testified that the horse may roll, which could also obviously result in injury to the rider. *Thus, because cinching a saddle is done by hand, and not with scientific precision, a provider must make a judgment call as to how tight or loose to cinch the saddle. This imprecision in the cinching of the saddle is "characteristic" or "typical" of and therefore "inherent in" the sport of horseback riding. It is an undesirable risk which is simply a collateral part of the sport. When the cinching of a saddle can be too tight or too loose, and the cinching is not done with scientific precision, it is inherent in the sport that the provider at times will cinch too loosely or too tightly.* Thus, the testimony of WRT's employee that a saddle hanging underneath a horse would be evidence that the saddle was not cinched tightly enough does not take us outside the realm of inherent risk. It does not explain why the saddle was not cinched tightly enough.

As part of the Coopermans' burden of showing that WRT owed Dr. Cooperman a duty of care, the Coopermans must provide some evidence to explain why the saddle fell, which explanation is not inherent to the sport. The Wyoming Legislature expressly stated in the Safety Act that a recreational provider has no duty to "eliminate, alter or control the inherent risks within the particular sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-123(b). Thus, stating only that the cinch was not tight enough does not show that the risk was no longer inherent to the sport. The Coopermans have the burden of presenting some evidence on summary

judgment that would raise a question of fact that the loosely cinched saddle was caused, not by an inherent risk, but rather by a risk that was atypical, uncharacteristic, not intrinsic to, and thus not inherent in, the recreational activity of horseback riding. The Coopermans have not met this burden.

Because under Wyoming law the question of what is an inherent risk is normally a question of fact for the jury, we do not attempt to set the parameters here as to what factual proof would take the risk of a slipping saddle outside the realm of an inherent risk. We can only say that presenting testimony that the saddle was not cinched tightly enough is not sufficient. As a result, this court agrees that there is no genuine dispute of material fact that would preclude summary judgment.

*Cooperman*, 214 F.3d at 1168–69 (emphasis added).

[¶ 21] Just as the trial court must scrutinize with great care the facts brought forward by the parties on a summary judgment motion, so too must this Court on appellate review of the summary judgment. Our standard of review directs that we use the same designated "fact" materials, those designated by the parties, as did the district court, and our review is de novo. It is as if the motion were filed in our Court, and we must consider it accordingly. Thus, this Court has adhered to the prescribed careful attention to factual detail in considering whether summary judgment is appropriate on the question of inherent risk:

> Our general answer to the question is that if such a motion is filed, the trial court must scrutinize the facts brought forward by the parties with great care. If the court can say that, given that evidence, this is an "inherent risk" and reasonable minds cannot differ about that, then summary judgment is appropriate. If the risk is an inherent one, then the provider has no duty to eliminate, alter, or control it. On the other hand, if reasonable minds could differ as to whether or not the risk was one inherent to the recreational activity, then summary judgment is not appropriate and the answer to the question must

be assigned to the jury (or other fact finder).

*Jackson Hole Mtn. Resort Corp. v. Rohrman*, 2006 WY 156, ¶ 3, 150 P.3d 167, 168 (Wyo.2006); *see also Beckwith v. Weber*, 2012 WY 62, ¶ 35, 277 P.3d 713, 722 (Wyo.2012) (whether particular risk is inherent in activity "is generally one for the jury to decide" and can be made as matter of law "only when the case involves undisputed facts and when reasonable persons could only conclude that an injury or death was caused by an inherent risk").

[¶ 22] The question we must answer in this case then is whether, upon our scrutinizing with great care the facts brought forward by the parties, the only conclusion reasonable minds could reach is that the Creels' injuries were caused by an inherent risk of golf.

### B. Application of Inherent Risk Analysis to Creel Injuries

[¶ 23] The Creels do not contest, and the evidence appears largely undisputed, that getting hit by a golf ball is, generally stated, an inherent risk of playing golf or being a spectator at a golf tournament. This statement of the inherent risk is of limited usefulness, however, because it is abstract and presents the question in a vacuum without consideration of the specific facts of the case. Just as the court analyses we discussed above required looking beyond generally-stated risks, such as falling from a horse or falling in a half-pipe while skiing, we must in this case look beyond the generalized risk of getting hit with a golf ball.

[¶ 24] Under our required inherent risk analysis, the question we must answer is whether L & L did anything to increase the risk that Mr. Creel would be hit by a golf ball. That is, did the conduct of L & L's agent, Kathy Irvine, increase the risk beyond what everyone agrees would normally be an inherent risk. It is when the question is framed with this specificity that we find genuine issues of material fact that preclude summary judgment.

[¶ 25] The Creels argue that L & L's negligence and not an inherent risk of golf caused their injuries because: 1) L & L

did not provide a safe area from which spectators could observe the competition; and 2) L & L's agent, Kathy Irvine, directed a player to hit a ball into players and spectators. We reject the Creel's first argument with respect to providing a safe area for spectator safety. As noted above, the evidence is undisputed that getting hit by a golf ball is generally an inherent risk of participating in a golf event, either as a player or a spectator. As such, L & L, in accordance with the Recreation Safety Act, had no duty to "eliminate, alter or control" that risk. *See* Wyo. Stat. Ann. § 1–1–123(b). We thus conclude as a matter of law that L & L had no obligation to provide a designated safe area for spectators to prevent them from being hit by a golf ball.

[¶ 26] That said, as the district court likewise recognized, L & L did have a duty to not increase the inherent risks of the sport. *See Dunbar*, 392 F.3d at 1149 (recognizing distinction between inherent risks and risks that "occur from the choices a recreation provider makes on behalf of the participant and from the conditions in which the recreational opportunity is provided"); *see also Cotty v. Town of Southampton*, 64 A.D.3d 251, 254, 880 N.Y.S.2d 656, 659 (N.Y.App.Div. 2009) (defendant's conduct may not unreasonably increase risk); *Levinson v. Owens*, 176 Cal.App.4th 1534, 1543, 98 Cal.Rptr.3d 779, 786 (Cal.Ct.App.2009) (recognizing defendant's duty to use due care not to increase sport's inherent risks); *Yoneda v. Tom*, 110 Hawai'i 367, 133 P.3d 796, 810 (2006) (golf course owner "has a duty to use due care not to increase the risks to a participant over and above those inherent in the sport"). Where we find disputed issues of material fact in this regard is in the question whether Kathy Irvine's actions increased the risk that Mr. Creel would be struck by a golf ball.

[¶ 27] Framed in the light most favorable to the Creels, and with the required factual specificity, the question is whether Ms. Irvine increased the risk that Mr. Creel would be struck by a golf ball by instructing Mr. Veesart to tee off when: 1) Mr. Veesart expressed concern that he could hit the green where he could see that the group ahead was still present; and 2) Ms. Irvine knew or should have known that there were spectators in the area of the Hole # 1's green. The facts relevant to this inquiry are: 1) Ms. Irvine's directions to Mr. Veesart and, more particularly, what the two of them said to each other; 2) Ms. Irvine's authority and ability to influence Mr. Veesart's actions; 3) the ability of Ms. Irvine and Mr. Veesart to see the spectators near the green of Hole No. 1; and 4) Ms. Irvine's knowledge that there were spectators near the green of Hole No. 1. We find each of these facts, and the reasonable inferences to be drawn from them, to be in dispute.

1. *Statements of Ms. Irvine and Mr. Veesart*

[¶ 28] As set forth earlier in this opinion, Mr. Veesart testified that he told Ms. Irvine that he did not want to tee off Hole # 1 because he felt he could hit the hole's green, where the group ahead of them was still present. According to Mr. Veesart, Ms. Irvine dismissed his concerns and told him he had to hit because the tournament was running behind schedule.

[¶ 29] In reviewing the record, this Court has found no evidence from Ms. Irvine detailing her account of the conversation she had with Mr. Veesart. In its decision letter, the district court noted:

Irvine remembers the events somewhat differently. According to her, she asked if anybody could drive the green and was told by several of the golfers in Veesart's group that they could. However, she remembers being told that if one of the players did manage to reach the green, the ball would probably land short and then roll to it. As a result, they waited until the group in front of them, which included Josh Creel, was safely on the green before hitting.

[¶ 30] We assume that the evidence of Ms. Irvine's recollection was properly before the district court and simply did not make it into the record on appeal. In any event, the evidence does not resolve the factual question of what Ms. Irvine and Mr. Veesart discussed before he took his tee shot off Hole # 1. The evidence serves only to highlight that there remains a disputed issue of mate-

rial fact as to the conversation between Ms. Irvine and Mr. Veesart.

## 2. *Ms. Irvine's Authority and Ability to Influence Mr. Veesart's Actions*

[¶ 31] L & L argues, and the district court agreed, that there was no disputed issue of material fact concerning Ms. Irvine's authority and ability to influence Mr. Veesart's conduct because it was undisputed that the golfer always makes the final decision when to hit the golf ball. We disagree that the evidence on which L & L and the district court relied resolves this genuine question of material fact.

[¶ 32] The record is replete with non-expert opinion testimony that a golfer is responsible for making the final decision when to take his or her shot. For example, Michael Northern, one of the professional golfers in Mr. Veesart's group, testified:

A. You know, as the starter, she designates the tee times.

Q. Right.

A. You know, so, I mean she's trying to follow a tee sheet, tee time structure.

Q. Right.

A. To where once it's that time, then she designates, "Okay, guys, you know, it's time to play." I feel that it's still the golfer's responsibility that if he can hit the ball into some people, that you don't do that. You wait until they clear out to where—because every golfer hits a ball a different distance, and each golfer knows that distance that they hit. So to me it's up to the golfer to wait to make sure that the people—you know, it's clear to actually play.

[¶ 33] This evidence does not, however, answer the question of the extent to which Ms. Irvine had the ability and authority to influence and did influence Mr. Veesart's decision to tee off. The evidence in the record concerning Ms. Irvine's authority and influence included:

—Mr. Veesart's own testimony that Ms. Irvine did influence his decision when to take his shot;

—Michael Lepore's testimony that Ms. Irvine is a starter during tournaments and during everyday play and that the scorecard used by the golf course during everyday play, although not during tournaments, contains a statement of the rule that "[t]he pro or starter shall have absolute control of play on the course;" and

—Mr. Creel's testimony concerning his observations of Ms. Irvine's demeanor when starting his son, Josh Creel:

A. We—we walked with my son Josh, who was playing. And he started on number 10, played the back nine first. As we walked up to the number 1 tee box, Haley Hartman, who was caddying for him, set his clubs down, and Josh started to walk inside.

At that point Kathy Irvine grabbed him by the arm and said, Where do you think you're going? Josh said, I have to go to the bathroom. And she said, We're behind. You need to get up here and hit.

Which angered me that she would physically grab a 16–year–old boy and—and talk to him like that. So Josh hit. I told Josh, Go ahead and go to the bathroom, which he did.

[¶ 34] Adhering to our standard of review, which requires that we consider the record from the vantage point most favorable to the party opposing summary judgment and give that party the benefit of all favorable inferences that may fairly be drawn from the record, we conclude that a genuine question of material fact remains regarding the question of Ms. Irvine's ability and authority to influence Mr. Veesart's decision to take a shot and thus increase the inherent risk at issue. *See Bangs,* ¶ 20, 201 P.3d at 452. In addition to Mr. Veesart's testimony that Ms. Irvine did influence his decision, the record supports a number of inferences concerning Ms. Irvine's authority, exercise of that authority and demeanor in exercising that authority. For example, a jury may fairly infer from the scorecard's advisement of the starter's "absolute control" that Ms. Irvine's demeanor and approach to directing golfers would be consistent with that advisement. Likewise, a jury may infer from Ms. Irvine's handling of Josh Creel that she was

quite controlling or adamant in her directions to the golfers.

[¶ 35] We do not mean to suggest that these are the only reasonable inferences that may be drawn from the record, but they are examples of reasonable inferences fairly drawn from the record that we must consider when reviewing summary judgment. The evidence on which L & L relied to support its motion for summary judgment did not address Mr. Veesart's testimony or the possible reasonable inferences that may be fairly drawn from the record. L & L's evidence was instead opinion evidence that, to the extent it was relevant and admissible, was directed to fault apportionment between L & L and Mr. Veesart, not to the impact of Ms. Irvine's conduct on the inherent risk to Mr. Creel of getting hit by a golf ball. Based on the evidence in the record, and the reasonable inferences that can be drawn from that evidence, we conclude that a genuine question of material fact remains regarding the question of Ms. Irvine's ability and authority to influence Mr. Veesart's decision to take a shot and thus increase the inherent risk at issue.

**3. *Ability of Ms. Irvine and Mr. Veesart to See Spectators***

[¶ 36] We also find genuine questions of material fact exist regarding the ability of Mr. Veesart and Ms. Irvine to see the spectators, such as the Creels, that were standing to the right of Hole # 1's green when Mr. Veesart teed off. Mr. Veesart and the other players in his group testified that they could not see the spectators because their view was obstructed by trees and bushes. On the other hand, a number of witnesses testified that the spectators would have been visible from Hole # 1's tee box, including Brandon Donahue, a player in the Creel foursome, Josh Creel, Josh Creel's caddy, Haley Hartman, and Sue Blyth and Hadley Berry, spectators standing next to Mr. Creel when he was struck.

[¶ 37] Brandon Donahue testified:

Q. Okay. And from where Mr. Creel, the plaintiff, was hit to the tee box, is that a situation where view would be a factor as far as knowing where the spectators are, or were they—

A. No, I don't believe so. I think that they'd be—that they would be pretty clearly in view.

Q. Okay. And why is that?

A. I guess because of the pretty direct nature of the hole. You know, again, it's a pretty straight hole. These trees here are pretty—you know, I mean, they're big, but they're kind of tall off the ground. These are a little bit shorter but bushy, but they weren't, I don't believe, hiding behind them. I mean, they were near them, but these trees are not far off this green. And so standing near them doesn't get them really out of the way of the hole.

Q. Would that change your opinion if they were, say, over in here (indicating)?

A. You know, not really. Because these trees are, you know—again, it's been a couple of years since I've been there, but these trees at this time as I recall are—are pretty, I don't know if the word is stout. I mean, they're pretty full. You can't really get inside of these here like you can perhaps under some other tree. You can't really get inside of these bushes.

Q. Okay. But you don't know for sure whether or not the people on the tee box could see them or not?

A. No, I don't know that for sure, no.

[¶ 38] Josh Creel testified:

Q. ... In your opinion, do you think that your parents and the Hultgrens could have stood in a safer place than where they were located?

A. Where they were standing was visible from the tee box. I don't think that it was an unsafe place by any means. You usually don't tee off when people are on the green with a club that you know can get there. But I didn't think they were in any harm standing there.

Q. You're not aware of whether or not the people on the tee box could actually see your parents, correct?

A. Maybe they couldn't. I've played that hole a ton of times, and you can see right where they were standing.

Q. So you would disagree with the two other golfers that have previously testified that they couldn't see your parents?

A. Was it the guy who hit the ball?

Q. It was the two other golfers.

A. If they were standing off the tee box to the right, possibly not. But if you're hitting that tee shot on number one in the Wyoming Open, you can see where my parents were standing.

Q. But you don't know for sure because you weren't on the tee box yourself, correct?

A. Correct.

[¶ 39] Haley Hartman, Josh Creel's caddy, testified that the spectators following their group were not standing in the bushes. By affidavit, Sue Blyth attested to the following:

2. While standing beside the green on Hole # 1, I was standing near James Creel, his wife Brenda Creel and others. While the golfers in that foursome were "putting out" on the green, James Creel was struck by a golf ball driven from the tee box on Hole # 1.

3. While we were standing beside the green and at the time Mr. Creel was struck by the ball, I was able to see the Hole # 1 tee box and the golfers on the tee box.

[¶ 40] Hadley Berry attested similarly, by affidavit, to the following:

1. On July 7, 2006, I was watching my friend Josh Creel compete in the Wyoming Open Golf Tournament at the Airport Golf Course in Cheyenne, Wyoming.

2. While I was standing beside the green on Hole # 1, with Mr. Creel and others, Josh Creel was "putting out" on the green. While Josh was putting, his father was struck by a golf ball driven from the tee box on Hole # 1.

3. Mr. Creel was standing immediately to my right. The ball flew over my head and struck Mr. Creel in the head. Once I realized what had happened, I turned toward the tee box and saw the golfers on the tee box and started running toward them.

[¶ 41] These witnesses testified as to what they believed was visible, based either on their particular vantage point or on their experience teeing off Hole # 1 and being familiar with its layout on that same day. Viewing the evidence in the light most favorable to the Creels, we cannot reject the testimony simply because the witnesses cannot testify to what Mr. Veesart or Ms. Irvine actually saw. No witness can ever stand in the shoes of another witness and testify as to what that witness saw. Nonetheless, a witness can provide relevant testimony, including conclusions, inferences or opinions, based on their own actual observations. *See* W.R.E. 701; *Tucker v. State,* 2010 WY 162, ¶ 18, 245 P.3d 301, 306 (Wyo.2010) (witness may testify to inferences or opinion "rationally based on his perception").

[¶ 42] A number of reasonable inferences can be fairly drawn from the testimony of Brandon Donahue, Josh Creel and Sue Blyth. From the viewpoint most favorable to the Creels, a jury might infer that the two other golfers in Mr. Veesart's group were unable to see as clearly as Mr. Veesart could from his vantage point; that the spectators were visible to Mr. Veesart and the other players, but Mr. Veesart and the other golfers did not notice them because they were preoccupied or distracted by their play or the play on the green; or that Mr. Veesart's testimony was not credible. Again, we do not mean to suggest that these are the only inferences or that they are the inferences a jury, or even this Court, would draw from this testimony. But they are reasonable inferences that the record supports and, given this evidence, we must conclude that whether the spectators were visible from the tee box is a disputed issue of material fact.

#### 4. *Ms. Irvine's Knowledge of Spectators Near the Hole # 1 Green*

[¶ 43] Ms. Irvine testified that when she started the Josh Creel foursome she saw a group of spectators walking the course with his foursome and that she recognized some of the spectators following his group. From this evidence, and the evidence described above concerning the visibility of the spectators from the tee box, a jury could infer that

Ms. Irvine knew or should have known that there were spectators near the green of Hole # 1. We thus conclude that questions of material fact exist as to whether Ms. Irvine knew or should have known that there were spectators near that green.

[¶ 44] Based on the conflicting evidence and the reasonable inferences that can be fairly drawn from the record, we find genuine questions of material fact exist and the jury must resolve the duty question. That is, the jury must determine whether L & L's agent, Kathy Irvine, increased the risk that James Creel would be struck by a golf ball, beyond the risk inherent in the sport, when she instructed Mr. Veesart to tee off when golfers and spectators were on and around the green and Mr. Veesart expressed concern that he could hit the group ahead of him.

[¶ 45] One final observation we must make is that we cannot determine, based on the record before us, and assuming the facts were resolved in Creels' favor, whether the resulting scenario is one that increased the risk of getting hit beyond the sport's inherent risk. For example, in *Cooperman*, the Tenth Circuit found that the loose saddle that caused the plaintiff to fall was a result of human error in the cinching of the saddle. The court went further, though, and found that such errors in judgment were an inherent risk in the cinching of saddles, and it affirmed judgment for the defendant. *Cooperman*, 214 F.3d at 1169. Similarly in this case, the question may be asked whether errors in judgment caused by trying to maintain the pace of play in a tournament are an inherent risk of the activity. Based on the record before us, we simply do not know the answer to that question.

## CONCLUSION

[¶ 46] Based on the conflicting evidence and the reasonable inferences that can be fairly drawn from the record, we find genuine questions of material fact exist and the jury must resolve whether L & L increased the risk that James Creel would be struck by a golf ball, beyond the risk inherent in the sport, when L & L's agent instructed a player to tee off when golfers and spectators were on and around the green and the player expressed concern that he could hit the group ahead of him. We thus reverse the entry of summary judgment and remand to the district court for proceedings consistent with this opinion.

GOLDEN, J., delivers the opinion of the Court; TYLER, D.J., files a dissenting opinion, in which SULLINS, D.J., joins.

TYLER, District Judge, dissenting, in which SULLINS, District Judge, joins.

[¶ 47] We would affirm the trial court's grant of summary judgment to Appellees as a matter of law, since there are no genuine issues of material fact in dispute.

**Summary Judgment Standard of Review**

[¶ 48] This Court's standard of review for an award of summary judgment is well-known. We must "examine the record from the vantage point most favorable to the non-movant party and that party receives the benefit of all favorable inferences which may fairly be drawn from the record." *Franks v. Indep. Prod. Co., Inc.*, 2004 WY 97, ¶ 9, 96 P.3d 484, 490 (Wyo.2004).

[¶ 49] Summary judgment is proper if no genuine issue of material fact exists and if the prevailing party is entitled to a judgment as a matter of law. W.R.C.P. 56(c); *Franks*, ¶ 9, 96 P.3d at 490; *Ware v. Converse Cty. Sch. Dist. No. 2*, 789 P.2d 872, 874 (Wyo. 1990). A genuine issue of material fact is a fact which, if proven, "would have the effect of establishing or refuting an essential element of a cause of action or defense which has been asserted by the parties." *Roitz v. Kidman*, 913 P.2d 431, 432 (Wyo.1996); *see also Franks*, ¶ 9, 96 P.3d at 490. "Material fact" has been defined as a fact falling into any one of the following categories:

[A fact] having legal significance which would ... control the legal relations of the parties; one upon which the outcome of the litigation depends in whole or in part; one on which the controversy may be determined; one which will affect the outcome of the case depending on its resolution; or, one which constitutes a part of

the plaintiff's cause of action or the defendant's defense.

*Reno Livestock Corp. v. Sun Oil Co.*, 638 P.2d 147, 151 (Wyo.1981) (citing *Johnson v. Soulis*, 542 P.2d 867, 871–72 (Wyo.1975)).

[¶ 50] A motion for summary judgment places an initial burden on the movant to make a *prima facie* showing that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. W.R.C.P. 56(c). Until the movant has made a *prima facie* showing that genuine issues of material fact do not exist, the non-movant party has no obligation to come forward to counter the motion with materials beyond the pleadings. *Rino v. Mead*, 2002 WY 144, ¶ 23, 55 P.3d 13, 20 (Wyo.2002). Once a *prima facie* showing is made, the burden shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact does exist. *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987). The party opposing a motion for summary judgment "must affirmatively set forth material facts in opposition to a motion for summary judgment, ... [and] cannot rely only on his allegations and pleadings." *Hyatt v. Big Horn Sch. Dist. No. 4*, 636 P.2d 525, 530 (Wyo.1981). "Conclusory statements or mere opinions are insufficient ... to satisfy an opposing party's burden." *Boehm*, 748 P.2d at 710. The whole purpose of summary judgment would be defeated if a case could be forced to trial by a mere assertion that an issue exists. *England v. Simmons*, 728 P.2d 1137, 1141 (Wyo.1986).

## Discussion

[¶ 51] Pertinent provisions of the Recreation Safety Act, Wyo. Stat. Ann. § 1–1–121 through § 1–1–123 (LexisNexis 2011), provide:

§ 1–1–122. Definitions.

(a) As used in this act:

(i) "Inherent risk" with regard to any sport or recreational opportunity means those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity;

(ii) "Provider" means any person or governmental entity which for profit or otherwise, offers or conducts a sport or recreational opportunity. This act does not apply to a cause of action based upon the design or manufacture of sport or recreational equipment or products or safety equipment used incidental to or required by the sport or recreational opportunity;

(iii) "Sport or recreational opportunity" means commonly understood sporting activities including baseball, softball, football, soccer, basketball, swimming, hockey, dude ranching, nordic or alpine skiing and other alpine sports, snowboarding, mountain climbing, outdoor education programs, river floating, hunting, fishing, backcountry trips, horseback riding and any other equine activity, snowmobiling and similar recreational opportunities and includes the use of private lands for vehicle parking and land access related to the sport or recreational opportunity[.]

* * * *

§ 1–1–123. Assumption of risk.

(a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

(b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

(c) Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved pursuant to W.S. 1–1–109.

* * * *

[¶ 52] The following facts germane to this appeal are not disputed:

1. At all relevant times, Appellees were "providers" of a "sport or recreational oppor-

tunity." Wyo. Stat. Ann. § 1–1–122(a)(ii), (iii).

2. Being struck by a golf ball on a golf course during play at a professional golf tournament is an "inherent risk" assumed by a participant of a "sport or recreational opportunity." Wyo. Stat. Ann. § 1–1–122(a)(i), (iii).

3. At all relevant times, as a spectator present on a golf course during a professional golf tournament, Appellant James Creel assumed the "inherent risk" of being struck by a golf ball. Wyo. Stat. Ann. § 1–1–122(a)(i), (iii) and § 1–1–123(a).

4. Appellees were not required "to eliminate, alter or control the inherent risks" to Appellant James Creel of being struck by a golf ball while he was a spectator physically present on a golf course during play at a professional golf tournament. Wyo. Stat. Ann. § 1–1–122(a)(i), (iii) and § 1–1–123(b).

5. The record is devoid of any acts or omissions by Appellees creating or causing a "non-inherent risk" of injury to Appellant James Creel.

[¶ 53] Within this appeal, Appellants do not steadfastly dispute whether being hit by a golf ball is an inherent risk of the sport of golf. Instead, they focus on the alleged negligent acts of Appellees, and argue that the act of directing the golfer to proceed to hit his drive on the first hole is not an act that is inherent to the game. In support of this position, Appellants rely upon Wyo. Stat. Ann. § 1–1–123(c) alone, and assert that such provision supports an exception applicable to the case at hand. Such an argument is flawed.

[¶ 54] If the language of the Recreation Safety Act is clear and unambiguous, then we should apply the plain and ordinary meaning of the words without resorting to the rules of statutory construction. Wyo. Stat. Ann. § 8–1–103(a)(i) (LexisNexis 2011); *Halpern v. Wheeldon*, 890 P.2d 562, 565 (Wyo.1995) (citing *Soles v. State*, 809 P.2d 772, 773 (Wyo. 1991)). The language of Wyo. Stat. Ann. § 1–1–123(c) is clear and unambiguous. The proper interpretation is one that focuses upon whether the risk is "inherent" to the "sport or recreational opportunity"—not the

nature of the conduct (*i.e.*, whether the conduct is negligent). *State v. Stern*, 526 P.2d 344, 351 (Wyo.1974) ("[L]egislative intent governs and that 'intent must be ascertained by reading it [the statute] according to the natural import of the language used without resorting to subtle and forced construction.'" (alteration in original) (quoting *State ex rel. Murane v. Jack*, 52 Wyo. 173, 70 P.2d 888, 892 (1937)). Accordingly, the negligence exception under Wyo. Stat. Ann. § 1–1–123(c) applies solely to "non-inherent risks."

[¶ 55] Inasmuch as the uncontroverted fact that being struck by a golf ball on a golf course during play at a professional golf tournament is an "inherent risk" assumed by a participant of a "sport or recreational opportunity," the negligence exception in subsection (c) does not apply. Wyo. Stat. Ann. § 1–1–122(a)(i), (iii) and § 1–1–123(c). To decide otherwise would effectively render the core purpose of the Recreation Safety Act a nullity.

[¶ 56] Appellees' motion for summary judgment made a sufficient *prima facie* showing that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law under the Recreation Safety Act. W.R.C.P. 56(c). The burden then shifted to Appellants to present specific facts showing that a genuine issue of material fact does exist. Moreover, Appellants "cannot rely only on [their] allegations and pleadings." *Hyatt*, 636 P.2d at 530; *see also England*, 728 P.2d at 1141.

[¶ 57] Appellants failed to present specific material facts to the district court showing that any "damage [or] injury [was] not the result of an inherent risk of the sport or recreational opportunity." Wyo. Stat. Ann. § 1–1–123(c). Therefore, as to the claims asserted by Appellants against Appellees, no genuine issues of material fact exist which "would have the effect of establishing ... an essential element of a cause of action." *Roitz*, 913 P.2d at 432; *see also Franks*, ¶ 9, 96 P.3d at 490; *Reno Livestock Corp.*, 638 P.2d at 151; *Johnson*, 542 P.2d at 871–72; W.R.C.P. 56(c).

[¶ 58] Pursuant to the Recreation Safety Act as a matter of law, Appellees should be

deemed immune from any and all liability arising from Appellants' claims against them. Wyo. Stat. Ann. § 1–1–123(a), (b).

**Conclusion**

[¶ 59] In this appeal, strictly involving Appellants' claims against Appellees, we would affirm the district court's grant of summary judgment in favor of Appellees as a matter of law under the immunity afforded them by the Recreation Safety Act, since there exist no genuine issues of material fact to be determined.